**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **RICHARD PAUL E., a minor,** ) | |
| **and ANNETTE S. B., Individually** ) | |
| **and as his Guardian and Next Friend,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **Case No. 07 cv 6911** |
| ) | |
| **PLAINFIELD COMMUNITY** ) | **Magistrate Judge Martin C. Ashman** |
| **CONSOLIDATED SCHOOL** ) | |
| **DISTRICT 202 and ILLINOIS STATE** ) | |
| **BOARD OF EDUCATION,** ) | |
| ) | |
| **Defendants.** ) | |

<u>**MOTION FOR LEAVE TO AMEND COMPLAINT**</u>

NOW COME Plaintiffs Richard Paul E., minor student, and Annette S.B.,

Individually and as his Parents and Next Friends, pursuant to F.R.C.P. 15(a) and Local

Rule 5.4, move for leave to amend their complaint against Plainfield Community

Consolidated School District 202 ("District") to add as a party the Illinois State Board of

Education ("ISBE"), and say as follows:

1.      On 11/9/07, ISBE's appointed hearing officer, Linda Mastandrea, issued an

administrative decision and order as ISBE Case No. 2007-0332.

2.`      On 12/7/07, the Plaintiffs filed their original Complaint to appeal that

administrative decision by the ISBE.

3.      On 1/17/08, the District filed its Answer to the Petitioner's original Complaint.

4.      Since this is an appeal of the administrative hearing decision below, the Court

requires a certified copy of the administrative record of the due process hearing and

proceeding below to adjudicate this appeal of that hearing decision.

5.      Counsel for Plaintiffs has consulted with opposing counsel for the District who has urged Counsel to file this Motion for Leave to Amend the Complaint to add ISBE as a party to obtain the certified copy of the administrative record below.

6.      The Plaintiffs hereby move to amend their Complaint and attach their First Amended Complaint to add the Illinois State Board of Education as a party defendant in the instant case.

**WHEREAS**, this Court requires the ISBE to file its certified copy of the administrative record in the special education due process proceeding,

**THEREFORE**, the Plaintiffs pray that the Court enter the attached First Amended Complaint in order to add ISBE as an additional defendant for the sole purpose of filing its certified copy of the said proceeding below.

Respectfully submitted 3/5/08.

_____

s/ Joseph Daniel Thomas, Attorney at Law
IL Attorney Bar Number: 6212202
Attorney for the Plaintiffs Richard Paul E. and Annette S.B.
10707 N. State Road 55, Demotte, IN 46310-9671
Telephone: 312.296.8203
Fax: 800.882.3714
E-mail: thomaslaw@netnitco.net

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RICHARD PAUL E., a minor,** | ) | |
| **and ANNETTE S. B., Individually** | ) | |
| **and as his Guardian and Next Friend,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 07 cv 6911** |
| | ) | |
| **PLAINFIELD COMMUNITY** | ) | **Magistrate Judge Martin C. Ashman** |
| **CONSOLIDATED SCHOOL** | ) | |
| **DISTRICT 202 and ILLINOIS STATE** | ) | |
| **BOARD OF EDUCATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## NOTICE OF FILING

To:    Darcy L. Kriha, Esq., & John Yu, Esq.,
       Franczek Sullivan P.C., 300 S. Wacker Dr.
       Suite 3400, Chicago, IL  60606. 312.786.6569 fax 312.986.9192;
       dlk@franczek.com

       Darren Reisberg, Esq., General Counsel, Illinois State Board of Education,
       Mail No. CH14-300, 100 N. 1st Street • Springfield, IL 62777 217.782.8535,
       DREISER@isbe.net

       PLEASE TAKE NOTICE that on or about 3/5/08, Plaintiffs presented to the
Clerk for filing their Motion for Leave to Amend with the attached First Amended
Complaint w/ Exhibit.

                                        _____
                                        s/ Joseph Daniel Thomas
                                        Attorney for Richard Paul E. and
                                        Annette S. B.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on 3/5/08, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

1)      Darcy L. Kriha, Esq., Franczek Sullivan P.C., 300 S. Wacker Dr. Suite 3400, Chicago, IL  60606.312.786.6569 fax 312.986.9192; dlk@franczek.com

2)      Darren Reisberg, Esq., General Counsel, Illinois State Board of Education, Mail No. CH14-300, 100 N. 1st Street, Springfield, IL 62777 217.782.8535, DREISER@isbe.net

And I hereby certify that on this same date, I also mailed by United State Postal Service,

the documents plus a Waiver of Service to:

1)      Darren Reisberg, Esq., General Counsel, Illinois State Board of Education, Mail No. CH14-300, 100 N. 1st Street, Springfield, IL 62777 217.782.8535, DREISER@isbe.net

_____
s/ Joseph Daniel Thomas, Attorney at Law
IL Attorney Bar Number: 6212202
Attorney for the Plaintiffs Richard Paul E. and Annette S.B.
10707 N. State Road 55, Demotte, IN 46310-9671
Telephone: 312.296.8203
Fax: 800.882.3714
E-mail: thomaslaw@netnitco.net

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **RICHARD PAUL E., a minor,** | ) | |
| **and ANNETTE S. B., Individually** | ) | |
| **and as his Guardian and Next Friend,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 07 cv 6911** |
| | ) | |
| **PLAINFIELD COMMUNITY** | ) | **Magistrate Judge Martin C. Ashman** |
| **CONSOLIDATED SCHOOL** | ) | |
| **DISTRICT 202 and ILLINOIS STATE** | ) | |
| **BOARD OF EDUCATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT

NOW COMES RICHARD PAUL E., ("Paulie") and ANNETTE S. B.,

("Annette") individually and as his Guardian and Next Friend , by and through counsel,

Joseph Daniel Thomas, Attorney at Law, and submit this Complaint against Defendants

PLAINFIELD COMMUNITY CONSOLIDATED SCHOOL DISTRICT 202 ("District")

and the ILLINOIS STATE BOARD OF EDUCATION ("ISBE"), and say as follows:

## I. INTRODUCTION

1.      This suit arises from the efforts of the Plaintiffs to enforce their rights to a free,

appropriate public education ("FAPE") for Paulie, a minor student with disabilities.

These rights are enforceable pursuant to the Individuals with Disabilities Education Act

as amended ("IDEA"), 20 U.S.C. § 1401 *et seq*. Paulie is an 11 year old child with

Aspergers syndrome (a disabling condition on the autism spectrum), attention deficit

hyperactive disorder ("ADHD") and Central Auditory Processing Disorder ("CAPD")

who requires specially designed instruction to learn. He is currently in the 5th Grade, but should be in the 6th Grade chronologically.

2.      This is an appeal of the final administrative Decision and Order (the "Final Order") by Impartial Hearing Officer ("IHO"), Linda Mastandrea, issued on 11/9/07 in Illinois State Board of Education ("ISBE") Case No. 2007-0332. (See Exhibit 1, Final Order). This ISBE-appointed IHO rendered this Final Order without pre-hearing or post-hearing briefs by either party even though requested by the Guardian's counsel. This Final Order followed a special education due process hearing pursuant to the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. 1401 *et seq.*[1] and related state law, including 23 IAC Part 226.

3.      This appeal is partially based on the procedural denial by the IHO of the Plaintiff's right to present evidence, and to confront, cross-examine and compel the attendance of witnesses. 34 C.F.R. 300.509 and 23 I.A.C. 226.625.

4.      This appeal is also partially based on the factually inaccurate and incomplete Final Order that contains errors of law and misapplications of law. That Final Order contained factual errors, omissions and misunderstandings of the administrative record, findings of facts that are contrary to the weight of evidence, and significant omissions, misinterpretations, mistakes, misapplications and/or disregard of the legal standards applicable to this case. The Final Order specifically failed to make sufficient findings as to the credibility of witnesses and failed to explain substantial testimony and material evidence that conflicted with the findings of fact and conclusions of law.

---

1. All references are to IDEA as amended in 2004 and regulations pursuant to it unless noted.

## II. JURISDICTION AND VENUE

5.     This Court has jurisdiction pursuant to F.R.C.P. 65; 28 U.S.C. §1331; and 20 U.S.C. §1415(i)(2).

6.     The Plaintiffs bring this action pursuant to the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. §1401 et seq. and its Procedural Safeguards at § 20 U.S.C. § 1415, including (j) (formerly §1415(e)(3)(hereinafter referred to as the "Stay Put Provision"), the Illinois School Code, 105 ILCS 5\14-8.02(a), and related state law.

7.     Venue is proper in this Court because the acts complained of occurred in and the parties reside in and do business in the Northern District of Illinois, Eastern Division.

## III. PARTIES

8.     At all times pertinent, Plaintiff Annette S. Butler has been the Guardian of Richard Paul E. ("Paulie") and here complains Individually and as his Guardian and Next Friend.

9.     At all times pertinent, the Plaintiffs have lived in Plainfield, Illinois, in Will County, Illinois.

10.    Paulie is an 11 year old child with Aspergers syndrome, ADHD and Central Auditory Processing Disorder ("CAPD") who has had speech and language services for some time to improve his articulation and his ability to speak in response to spoken language when background noise is present. He is currently in the 5th Grade, but should be in the 6th Grade.

11.    Routine is important for Paulie. He can be well-behaved and pleasant, but when his regular routine is interrupted or he is exposed to large crowds and noise, he can misbehave, become unruly and have his composure "melt down."

12.     Paulie at all times pertinent has been determined eligible for special education. There is no dispute as to eligibility, but there is a dispute as to whether the District's proposed placement is the least restrictive environment since it is a self-contained classroom segregated from nondisabled children, yet the Plaintiff's proposed placement at Acacia Academy contains at least two nondisabled children in Paulie's classroom that is not self-contained.

13.     The Defendant District acts as a Local Educational Agency ("LEA") under IDEA regulations found at 34 C.F.R. Part 300 *et seq.* and related state regulations found at 23 IAC Part 226 and is responsible for ensuring FAPE for students with disabilities.20 U.S.C. §1412(a), *see also* 105 ILCS 5\14-1 *et seq.*

14.     The Defendant ISBE acts as a State Educational Agency ("SEA") under these same regulations, appointed the IHO in the administrative proceeding below, is responsible for providing the Court with a certified copy of the administrative proceeding below, and is brought in as a defendant here for the sole purpose of providing that record to the Court.

## IV. OVERVIEW OF APPLICABLE LAW

**IEPs Must be Developed Cooperatively**

15.     The IDEA is designed to "assure that all children with disabilities have available to them...a free and appropriate public education ("FAPE")." in the least restrictive environment. 20 U.S.C § 1400(c).

16.     The IDEA has been codified in the federal regulations at 34 CFR Part 300 *et seq.* and the state regulations at 23 IAC Section 226 *et seq.*23 IAC Section 226.10 states that "the requirements ...shall apply in every instance when a child is or may be eligible for

special education and related services."

17.     IDEA and its regulations contain Procedural Safeguards to ensure due process rights of presenting evidence, confronting and cross-examining witnesses. Those Procedural Safeguards also ensure the maintenance of the child's educational status quo in a stay put placement with all services required by his IEP during a due process hearing and judicial appeals.34 C.F.R. 1415 *et seq*.

18.     To insure that disabled children receive FAPE, the IDEA requires that school districts work with parents to create an IEP which sets forth the child's educational goals.20 U.S.C. §§1401(11), 1414(d).

19.     IDEA Section 1414(d)(4)(A) requires that the school review the IEP at least annually "to determine whether the annual goals for the child are being achieved" and revise the IEP to address "any lack of expected progress toward the annual goals" and "the child's anticipated needs".

20.     The IEP must include specific information such as a statement of the child's present levels of performance, including how the child's disability affects the child's involvement in the general education curriculum, annual goals and short term objectives for improvement, a description of the specifically designed instruction and services that will enable the student to meet the goals, lack of any progress towards the goals and the extent to which the child will participate with nondisabled peers.20 U.S.C.§1414(d).

21.     The IDEA obligates the District to address the student's unique educational needs through an IEP if the District determines that the student meets the criteria for at least one of the categories of disabilities enumerated in the IDEA and its implementing regulations. 20 U.S.C. §1414.

22.     Once determined eligible, a District must provide an appropriate program and placement responsive to all of the child's unique needs.23 IAC 226.50(d).

**Continuum of Placement Options**

23.     The District must review a continuum of placement options, starting with the regular education classroom, to determine the least restrictive one in which the student's program can be implemented.

24.     If there is more than one appropriate placement, the District must place the student in the one that is the least restrictive.

25.     Federal and state law provides Parents with the right to request an impartial Due Process Hearing if the parents disagree with any matter related to the identification, evaluation or educational placement of the student or provision of FAPE to the child.20 U.S.C. §1415(b)(6) & (d)(2)(j); 23 IAC 226.605.

26.     The U.S. Supreme Court has found that schools must offer more than mere token gestures or a trifle, where the student displays considerable intellectual potential, since the IDEA requires a great deal more than a negligible benefit. *Board of Education of the Hendrick Hudson Central School District, Westchester County, et al v. Amy Rowley, et al*, 458 U.S. 176 (1982),

## V. FACTS

**Paulie Has Attended Easter Seals for Years**

27.     Prior to the 2004-2005 School Year while Paulie was enrolled in the District, Paulie had been placed at Easter Seals Therapeutic Program in Tinley Park, Illinois at the Guardian's request due to the failure of the District to properly educate Paulie in District.

**Easter Seals Admitted Academics Insufficient**

28.     Easter Seals staff admitted in testimony that it could not teach academics sufficiently to Paulie as early as January 2006 and exhibits corroborated this.

29.     In the spring of 2007, the District agreed to conduct the required entrance evaluation for Paulie at Acacia Academy, a private school for both disabled and nondisabled students in LaGrange Highlands, Illinois at the Guardian's request. Although the District claimed at hearing that this was merely an independent education evaluation, the Guardian, her advocate and the Director of Acacia Academy, Kathy Fouks, testified that the District led them to believe it was the beginning of a process for placement at Acacia.

30.     On June 14, 2007, an IEP Meeting was conducted for Paulie. The notes[2] of this meeting state, "Current speech and language, OT and social work goals will continue."

31.     Although the speech and language service goals continued in that IEP, all testimony indicates that the amount of services was never discussed. That is, there were goals, but there were no service minutes per week allocated to accomplish them in the 6/14/07 IEP. This is a violation of law.

32.     During this IEP Meeting, the District decided to place Paulie in a self-contained classroom within the District at Meadowview and refused the Guardian's proposal for Acacia placement over the Guardian's objections.

---

2. The notes referenced and attached here is the "Second IEP Version" and was given to the Mother and the Parent Advocate after the IEP Meeting of June 14, 2007.  The version falsified by the District is called the "Third IEP Version" and contains an identical statement about speech and language continuation.

**Multiple IEP Versions Produced by District**

33.     At the end of this IEP Meeting, the Guardian's advocate and the Mother requested a copy of the IEP Notes. These IEP Notes document things like the comments of the participants, the options considered and the reasons for decision. They had been input at a computer terminal during the Meeting. The District staff initially refused to provide a copy of the IEP Notes, then agreed. Rather than printing out the original IEP Notes (the First IEP Version) from the computer for them, the District staff person, Susan Jawor, proceeded to erase sections of paragraphs and sentences while they watched. The District staff person made the excuse that she was "cleaning up" the IEP Notes, over the advocate's objections.

34.     After making substantial erasures, the District staff gave the Guardian's advocate the resulting printout containing both the IEP Notes and Goals (the Second IEP Version).

35.     On June 20, 2007, Annette Butler filed a due process complaint through the District regarding violations of her rights as guardian and the rights of the minor Student, Paulie, including the key allegation that Meadowview was too restrictive. Subsequently, the District forwarded the Complaint to the Illinois State Board of Education ("ISBE") which assigned an Impartial Hearing Officer, Linda Mastandrea.

36.     Soon after the Guardian filed the due process Complaint, the District sent the Guardian another IEP version (the Third IEP Version) regarding the June 14, 2007 IEP Meeting, claiming it was the final IEP. The Third IEP Version included new information including minutes of services, time in restrictive settings, but nothing about the beginning time or duration of mainstreaming with nondisabled peers or specially designed instruction & teaching approaches for reading or math. She and the Mother finally

received on June 22, 2007. This is delay in providing an IEP to the Guardian is violation of law.

37.    This Third IEP Version was drafted by the District to improve its legal position for the hearing regarding the key allegation that Meadowview was too restrictive.

38.    Of course, Paulie needs smaller class sizes so he is not overstimulated which causes him behavior problems. So the District changed the IEP to show a regular class setting as containing fewer students. This would make it appear that he could participate in nonacademic classes with those regular education students to make up for the restrictiveness of the self contained classroom at Meadowview. This Third IEP Version specifically reduced the number of students the District claimed were contained in its regular education classes from 27 to 17.

38.    The District staff admitted at hearing that its proposed placement at Meadowview was a self-contained classroom. The District argued at hearing, however, that Meadowview would still allow Paulie to participate with nondisabled students in regular education programs for nonacademic areas, like music, outside the self contained classroom. The District claimed that with settings of 17 (rather than 27 students), Meadowview was the least restrictive environment because Paulie would be exposed to his nondisabled peers without overstimulating. Of course, the Guardian explained that Paulie would be overstimulated anyway with 17 students and explained that this could not possibly work and that Paulie's unique needs would melt down when exposed to these relatively large, noisy crowds of small children. Further, the District never described in any 6/14/07 IEP version the extent to which Paulie would participate with nondisabled peers as the law requires.

39.     The Guardian testified that Paulie needs small settings like Acacia and would not be able to maintain his composure in a setting crowded and noisy. This would make a setting with 27 student worse than one with 17 students and explain why the Guardian continued to object to the District's proposed placement at Meadowview. It would also raise serious concerns about the structure of those settings because the IEP states that Paulie's environment must be structured which is typical for those on the autism spectrum.

39.     The IHO, however, discounted the significance of this deceptive change in the IEP versions and as well as Paulie's dislike of crowds and noise. The Final Decision favored Meadowview because the IHO concluded that Paulie could interact with lots of nondisabled children in nonacademic settings where she apparently believed that 17 students would be present as stated in the Third IEP Version.

**District Violated Status Quo During Stay Put**

40.     After the Guardian filed for due process hearing, the District provided at least two written assurances that it does not dispute stay put for Paulie at Easter Seals Therapeutic School Program ("Easter Seals") and intended to provide him with his program in that setting.

41.     On September 5, 2007, the Easter Seals Coordinator Maryellen Bucci wrote a letter addressed "Dear Parents" which she sent to Annett S. Butler in which she states, "your child is not receiving speech and language services." Ms. Butler became alarmed that the District could not be trusted in providing the services required by his IEP, including speech.

42. This Easter Seals letter is an admission by a party in interest, the contracting agent of the District, that the District had changed the status quo for Paulie and breached its commitment and the statutory obligation to continue stay put at Easter Seals as that program was required by his then-current IEP when the Complaint was filed.

43. Easter Seals personnel wrote on the letter "[s]till getting group speech," however, does not fulfill the requirements of the then-current IEP or is it responsive to Paulie's needs.

44. Paulie's services have been repeated in several IEPs as 60 minutes pull-out. That is, pull Paulie out of class for one on one, speech pathology services.

45. Easter Seals asserts in its letter that "[p]er Illinois State Board of Education, Easter Seals is in compliance because all schools in this state have a 30 day grace period in between the hiring of clinical staff." *Id.*

46. This statement may or may not be accurate, but even if accurate, compliance with state rules of program certification does not provide an adequate legal reason to change the status quo during the due process proceeding here, nor could it trump the federal right to stay put in the student's then-current educational placement.

47. The District's breach of its commitment required the Petitioners to file a Motion to enforce the rights of the Petitioners to Stay Put under IDEA. The District thereafter came into compliance on stay put.

48. By this breach of stay put, the District had further violated the procedural safeguards of the Plaintiffs.

Guardian Discouraged from Observing Meadowview

49. On 6/20/06, the Plaintiffs filed a Complaint for a due process hearing with the

District that was referred finally to the Illinois State Board of Education three days late, or on 6/28/07.

50.     On 6/28/07, the ISBE appointed IHO Linda Mastandrea to conduct the administrative hearing.

51.     On 7/17/07, the District finally provided the Response to the Complaint required by IDEA, but failed to do so within 10 days that was by June 30, 2007. This was a violation of procedural safeguards.

52.     Prior to the hearing, the Guardian attempted to arrange a temporary, diagnostic placement at Meadowview to determine whether Paulie could be educated in district, but the District staff began to initiate arrangements for the diagnostic placement before the Guardian had agreed to the final terms of this temporary placement. As a result, the Guardian withdrew her offer.

53.     On 10/22/07 and 10/23/07, the IHO conducted the hearing

54.     On 11/9/07, or six days after the required deadline, the IHO issued her Decision and Order in favor of the District.

55.     On 12/4/07, the Guardian renewed her offer to place Paulie temporarily in Meadowview as a diagnostic placement to determine whether it was in fact appropriate for Paulie.

56.     On 12/6/07, the District refused the Guardian's offer for a diagnostic placement during the stay put period, even though this is the very placement proposed by the District and ordered by the IHO. Clearly, the District does not want its proposed placement scrutinized.

## VI. APPEAL OF FINAL ORDER

### IHO Denied Discovery Needed to Confront District Contentions

57.     One reason for appeal of the Final Order is that the IHO denied the Parents' the right to discover and present the evidence they needed on issues, and to confront and cross- examine witnesses as is their statutory right under IDEA.

58.     This prevented the Parents from confronting the District's contentions and from preparing and offering evidence of an expert report on any observed problems.

59.     It also prevented them from avoiding surprise from testimony of District witnesses whom the Parents could not effectively cross-examine as a result.

### IHO Deferral to District Staff w/o Explaining Conflicting Evidence

60.     Another reason for appeal of the Final Order is that it inappropriately and illogically deferred to the testimony of the District personnel who were not teaching Paulie at the time.

### Final Order Not Thorough and Complete

61.     Another reason for appeal of the Final Order is that it was not thorough and complete as shown below. The Final Order did not contain any explicit determination of the credibility of witnesses nor a systematic consideration of specific testimony or exhibits that refuted the District's evidence or contentions at hearing.

62.     This lack of scrutiny of the available evidence made the Final Order a statement of personal opinion of the IHO, rather than a fair and impartial adjudication based upon a complete review of the evidence. Because of the Final Order was not thorough and complete, it could not fairly determine that the issues presented at hearing.

**Final Order Contains Multiple Mistakes of Law & Fact**

63.    Another reason for appeal is that it contained multiple mistakes, misinterpretations and misapplications of law[3] and/or disregard of the legal standards applicable. Many legal mistakes correlated with factual errors and omissions in the Final Order.[4] The Final Order indicates the IHO did not understand or was unwilling to address directly the legal issues presented by the Parents.

64.    The Final Order contained misapplications of legal standards for determining whether procedural rights were violated.

65.    It used incorrect standards for determining which IEP version was the document the Parent was to rely upon as a singular, written placement offer. This also allowed the nonspecific IEP terms to give the District too much power to decide supports, service minutes and teaching approach without participation of the Guardian.

66.    It failed to use the correct standards in determining whether the terms of an IEP are vague or subject to multiple interpretations. This failure resulted in a Decision that allowed the District to neglect its duty to inform teachers of their specific responsibilities with regard to implementation. It also resulted in allowing the District to fail to inform the Guardian as to how to cooperate with the District's program for Paulie and be involved in this program.

---

3. According to the Seventh Circuit, when the issue is a purely legal issue, no deference is due the IHO's determination. Morton Community Unit School Dist. No. 709 v. J.M., 152 F.3d 583, 587 (7th Cir. 1998); Dale M. ex re. Alice M. v. Board of Educ., 237 F.3d 813, 817 (7th Cir. 2001).
4. Where the IHO disregards the law and facts of a particular case, the court will not afford it due weight, and will not uphold the IHO's decision if it is not "legally and factually justifiable." Shirk v. Dist. of Columbia, 756 F.Supp. 31, 33 (D.D.C. 1991).

67.     It used incorrect standards for determining whether IEP was reasonably calculated to provide FAPE and for determining the length of time a District can take to provide an appropriate placement.

68.     It used inadequate standards for assessing appropriateness of the District's proposed placement at Meadowview as the least restrictive environment.

69.     It misstated testimony of the Guardian who actually wanted to observe possible District placements, but testified she was refused that opportunity by the District.

70.     It incorrectly added unilateral District assertions about programming and services in testimony rather than the actual terms within the four corners of the IEP when assessing appropriateness of Meadowview.

71.     It applied the incorrect LRE standards and ignored the instructional inclusion of nondisabled students in the Acacia Classroom.

72.     It failed to acknowledge the materiality of District admissions that it unilaterally created portions of IEP w/o Guardian's participation and input.

73.     IHO failed to explain why the testimony of the Guardian and her advocate, Mr. Michaels, could be discounted when they directly denied the appropriateness of Meadowview and denied the existence of a purported agreement at an IEP Meeting that Meadowview was appropriate. There was no such agreement.

74.     It misstated facts in evidence of Acacia's inclusiveness as a private school, and therefore misjudged Acacia as more restrictive than Meadowview.

75.     It misstated facts of the specific classroom proposed for Paulie at Acacia.

76.     It ignored Easter Seals' destruction of Paulie's behavioral records.

77.     It ignored the District school psychologist's admission that she destroyed protocols of disputed intelligence and other testing immediately after testing Paulie. After being confronted with the express illegality of such destruction under state law and also confronted with evidence claiming that she had forwarded the protocols to the Guardian, she then reversed herself and claimed she had "forgotten" that she had brought a copy to the IEP Meeting but failed to give it to the Guardian. Her story made no sense. Clearly, she was changing her story to try to fit the documents at hearing.

78.     The Final Order failed to make credibility determinations on key witnesses, such as the District Psychologist, yet relied upon their testimony in the face of conflicting evidence, and even relied upon the bare assertions of the District's counsel without any basis in evidence.

79.     The Final Order ignored the significance of the needs of Paulie as a child on the autistic spectrum who gets upset in large, noisy classroom and nonacademic settings like the ones proposed and claimed in testimony for Meadowview.

**Least Restricted Environment Miscalculated**

80.     The Final Order ignores the purpose of the legal requirements of least restrictive environment. It misinterprets the Plaintiff's evidence and overstates the District's evidence regarding least restrictive environment and related services by which the Final Order favored the District's proposed program and placement. Moreover, it completely disregards and fails to explain substantial conflicting testimony about the placements.

81.     The purpose of the least restrictive environment preference in IDEA is to encourage children with disabilities to be educated with nondisabled children to the maximum extent appropriate.

82.    The record also shows that the District's proposed IEP is not as the District witnesses testified to was. It was more restrictive than claimed by the District witnesses.

83.    The record shows that Acacia's instructional classroom is integrated with students who are not disabled, whereas Meadowview's instructional classroom is segregated and contains no nondisabled students.

## VIII. SUPPLEMENTAL EVIDENCE

84.    The Guardian's request consideration here of additional evidence for admission that was denied by the IHO or was otherwise unavailable to the Plaintiffs during that hearing.

85.    The Plaintiffs a request discovery and admission of all correspondence, including email records between the District and its contractor, Easter Seals, regarding the Guardian and Paulie. Prior to hearing, the Plaintiffs had requested all records regarding the Plaintiffs from the District and Easter Seals, including emails, but the District claimed there were only a few emails that had been already disclosed. Hearing testimony, however, revealed that there were many more emails between the District and Easter Seals than those disclosed.

86.    The Plaintiffs request discovery and admission of all records created by Easter Seals regarding Paulie's behavior. Hearing testimony revealed for the first time that Easter Seals destroyed all behavioral records of Paulie. Easter Seals and the District had not disclosed this fact previously, in spite of disclosure requests.

87.    If the Easter Seals records have been destroyed as Easter Seals staff stated in testimony, then the Plaintiff intends to submit a motion regarding the intentional destruction of evidence.

88.     The Plaintiffs request admission of certain phone records of the Guardian. These records refute District testimony claiming that no phone call was conducted with the Guardian regarding her attempts to cooperate with the District in conducting observations of potential placements. The Guardian had no indication prior to hearing that the existence of calls with the District personnel would be denied by District personnel.

89.     The Plaintiffs request a discovery order to conduct a professional observation of the self contained classroom and regular education settings assigned to Paulie in the June 14, 2007 IEP and admission of the resulting professional observation report.

90.     The District did not even state that Meadowview was a placement option until 6/14/07. For many months prior to the June 14, 2007 IEP Meeting, however, the Guardian had attempted to cooperate with the District to observe possible placements for Paulie, but the District kept obstructing this process. The District discouraged the observation of the Meadowview setting by the Guardian. Twice the Guardian has offered to place Paulie in a temporary, diagnostic placement to determine whether Paulie can be educated in the District's proposed Meadowview placement, but the District disrupted the Guardian's first attempt, then refused its second attempt.

91.     The Plaintiffs request admission of official certifications and records documenting the nature of Acacia Academy as a private school that serves both disabled and nondisabled students, and that each class setting contains nondisabled children as well as disabled children.

92.     The Plaintiffs request that ISAT Scores be admitted into evidence to refute the District's inaccurate claims about them, Acacia's evaluation and Paulie's current

academic progress. This evidence was unavailable to the Plaintiffs prior to the deadline for hearing.

93.     The Plaintiffs request that a new psychoeducational evaluation be allowed for the Plaintiffs to professionally confirm and interpret the ISAT Scores misrepresented by the District at hearing and that the resulting Report be admitted along with the observation report.

94.     The Plaintiffs request that additional evidence be considered in this case regarding records in the possession of the District and its agents.

## COUNT I

**DISTRICT HAS DENIED FAPE FOR PAULIE BY ITS PROCEDURAL VIOLATIONS OF IDEA & BY DENYING AN APPROPRIATE PROGRAM & PLACEMENT RESPONSIVE TO HIS UNIQUE NEEDS IN THE LEAST RESTRICTIVE ENVIRONMENT SINCE HIS PLACEMENT AT EASTER SEALS BECAME INAPPROPRIATE, INCLUDING PERIODS OF DENIAL OF NEEDED SERVICES DURING STAY PUT.**

95.     For paragraph 95, Plaintiffs incorporate all of the preceding paragraphs (1-94) by reference.

96.     The District's placement at Easter Seals was inappropriate for Paulie for many months without a change within a reasonable time by the District.

97.     The District's proposed IEP of 6/14/07 for Paulie was not reasonably calculated to provide Paulie with educational benefit.

98.     The District violated IDEA by not providing a singular, written offer of placement immediately after the end of the 6/14/07 IEP Meeting.

99.     The District's proposed placement at Meadowview is inappropriate and not the least restrictive environment.

100.    The Guardian's proposed placement at Acacia was appropriate and the least

restrictive environment for Paulie.

THEREFORE, Plaintiffs Richard Paul E. and Annette S. B. individually and as his Parents and Next Friends respectfully pray that this Court enter judgment in their favor and against the Defendant as follows:

A.) Find that the Plaintiffs are the prevailing party in this matter and reverse the Decision and Order of the IHO in this case and rule in favor of the Plaintiffs;

B.) Find that the District has violated the procedural safeguards granted by IDEA to the Plaintiffs.

C.) Find that the temporary denial of stay put services during litigation and other violations of law were procedural safeguard violations.

D.) Find that the District's proposed IEP of 6/14/07 was not reasonably calculated to provide educational benefit because it offered an inappropriate placement that was not in the least restrictive environment.

E.) Order compensatory education to make the Plaintiffs whole for the deprivation of education opportunity for Paulie and for the denial of the Guardian's opportunity to participate in the formulation of FAPE;

F.) Order that Paulie be placed at Acacia Academy at public expense, including all normal and necessary costs of attendance, including all tuition, fees and related services, including transportation;

G.) Order the Defendants to pay costs, including court costs and reasonable attorney's fees for this action;

H.) Award such other different and appropriate relief as justice may require.

Respectfully submitted
And Dated: 3/5/08

_____

s/ Joseph Daniel Thomas, Attorney at Law
IL Attorney Bar Number: 6212202
Attorney for the Plaintiffs Richard Paul E. and Annette S.B.
10707 N. State Road 55, Demotte, IN 46310-9671
Telephone: 312.296.8203
Fax: 800.882.3714
E-mail: thomaslaw@netnitco.net

**Case Number:      2007-0332**
**Richard Paul Eberhart vs. PLAINFIELD SD 202**
**Hearing Officer: Linda Mastandrea**

Illinois State Board of Education
Special Education Services
100 North First Street
Springfield, Illinois 62777

# Impartial Due Process Hearing Decision
# Cover Page

Instructions:  Complete this form and return it along with the decision.
The information collected on this form will be used for the purpose of indexing the decision by subject matter as required by 23 Illinois Administrative Code 226-695

**District Name      PLAINFIELD SD 202**

**Phone:  8155774000**

| | |
|---|---|
| **Superintendent** | **DR JOHN HARPER** |
| **Address** | **15732 HOWARD ST PLAINFIELD, IL  60544** |
| **Represented by** | **Darcy Kriha, Franczek Sullivan, PC** |

**Parent Name      Annette Butler**

**Phone:  8154363776**

| | |
|---|---|
| **Address** | **23314 West Grinton Plainfield, IL  60566** |
| **Represented by** | **Joseph Daniel Thomas, Esq.** |

### Date and Timelines

**Date of Written Request:   06/25/2007**
**Date of Pre-hearing Conf: 09/25/2007**

**Date of Hearing: 10/22/2007 to 10/23/2007 12:00:00 AM**
**Date of Decision: 11/9/07**

### Summary of Decision

-
Guardian filed due process complaint alleging, among other things that her procedural rights were violated, and that the proposed in district placement for her grandson did not provided a free appropriate public education in the least restrictive environment. Guardian and family proposed placement in a private, therapeutic day school.

-
-
-
-

## ILLINOIS STATE BOARD OF EDUCATION
## SPECIAL EDUCATION DUE PROCESS HEARING

**IN THE MATTER OF**
**Richard Paul Eberhart**

  **v.**

**PLAINFIELD SD 202**
)
)    **ISBE CASE NO. 2007-0332**
)
)    **Linda Mastandrea**
)      Impartial Due Process
)      Hearing Officer

### Decision and Order

### Jurisdiction

This matter is before the undersigned-hearing officer for a due process hearing pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA 2004"). 20 U.S.C. 1400 et seq. (2004). This hearing officer has jurisdiction pursuant to 20 U.S.C. 1415 et seq. (2004), 105 ILCS 5/14-8.02a et seq., and 23 Il. Adm. Code 226.600 et seq.

The guardian, through her attorney, filed a due process complaint on June 20, 2007. The District received the complaint on June 25, 2007 and forwarded it to the Illinois State Board of Education ("ISBE") where it was received on June 28, 2007. The undersigned was appointed as hearing officer by ISBE on June 28, 2007, via letter, which the hearing officer received on June 29, 2007. This hearing officer subsequently sent out a Preliminary Scheduling Order on July 3, 2007.

A resolution session was held on August 6, 2007 which did not resolve any of the issues. Numerous status teleconferences were held between the appointment of the hearing officer in June and convening of the hearing in October.

The parties also filed numerous pre-hearing motions. The student filed a Motion to Hold Respondent in Default, a Motion for a Stay Put Order, and a Motion in Limine Seeking Suppression of Evidence and Testimony. The district filed a Motion to Remove Student's Advocate. The hearing officer issued interim orders on each of these motions, which are included in the administrative record.

The parties jointly requested an extension to the forty-five day time line for a hearing, which was granted on August 7, 2007. The prehearing conference was held via teleconference on September 25, 2007. The due process hearing in this matter was held on October 22 and 23, 2007, at the Plainfield Academy, 305 W. Lockport St., Plainfield, IL. The guardian and student were represented by Joseph Daniel Thomas, Esq. The district was represented by Darcy Kriha of Franczek Sullivan, P.C.

### Issues Presented and Remedies Sought:

1. Whether the district failed to evaluate the full nature and extent of the student's disability.

2. Whether the district failed to allow the guardian to fully participate in the formation of a free, appropriate

public education for the student.

3. Whether the district failed to provide the student with an IEP which was reasonably calculated to provide a free, appropriate public education.

### The relief being sought is:

1. Student seeks an order providing for compensatory education at Acacia including summer school.

2. Student seeks a finding that District violated procedural safeguards.

3. Student seeks an order providing a parent advocate of his choosing at District expense for all IEP meetings in the future.

4. Any other and further relief the hearing officer deems appropriate.

### District's Response:

The District seeks an order that the placement recommended by Student's IEP team provided him with a FAPE in the least restrictive environment, and that the placement at Acacia requested by the family is not appropriate and is too restrictive based on the unique needs of the Student.

### Burden of Proof

The parent has the burden of proof as she filed the due process complaint. *Schaffer v.Weast*, 126 S.Ct. 528 (2005). Under Illinois law, the school district must provide evidence that it has appropriately identified the student's educational needs and that the special education and related services are adequate, appropriate, and available.105 ILCS §14-8.02a(g).

### Findings of Fact:

1. Student is an 11 year old boy living with his maternal grandmother who is also his guardian, his biological mother, his grandfather and an uncle. The guardian has had custody since he was just under a year old.
2. Student has been diagnosed with multiple disabilities including learning disabilities in reading and writing, speech/language and other health impairments. He has been educated at Easter Seals for most of his education, beginning at Riverview School in the district.
3. Student's current IQ is 96, and he is the highest functioning 5th grader in his class at Easter Seals.
4. According to his teachers, student is a pleasant, talkative, happy boy. He greets his teachers, asks appropriate questions, and has a good sense of humor. He is sensitive and caring, and enjoys animals. He wants to make friends, but has trouble making friends with the children at Easter Seals. He had some behavioral issues in the past, such as hitting and chewing on his clothes.
5. Student has a long history of testing and evaluation for disabilities beginning as a young child. Since he

has been involved with the school district, he has undergone numerous tests and evaluations.

6. In 2001, student was determined to meet the criteria for developmental delays in three domains, social/emotional, adaptive, and communication. He was placed at the Early Childhood Center where he received the services of a special education teacher and a speech language pathologist. In September, 2001 a behavior plan was initiated because he was hitting. Within the last year, his behavior plan and concomitant diagnosis of ED have been discontinued.

7. In January, 2002, student had an evaluation for suspected learning disabilities, and was put on a trial of Ritalin for ADD with hyperactivity diagnosis.

8. In May, 2002, student had testing and reevaluation, including a psychological assessment. He was found eligible for continued special education services on the basis of emotional disorder and secondary health impairment of ADHD.

9. In May, 2003, student was evaluated by a neurologist who said while he had symptoms of ADHD, they appeared to be part of a more complex problem. This conclusion was buttressed by the fact that the physician observed other behavioral difficulties atypical of ADHD and that he responded poorly to trials of both Ritalin and Strattera, commonly prescribed for ADHD.

10. Student had a psychological and neuropsychological evaluation conducted by Abigail Sivan, Licensed Clinical Psychologist, with a report issued on July 24, 2003. (Dist. 481; Parent 78). The evaluator found student to be "intellectually and academically competent" with no suggestion of the presence of a learning disability. He showed strengths in ability to learn and in abstract, nonverbal reasoning and weaknesses in ability to produce complex language structures and to sustain attention. The evaluator found the student "immature, with significant unresolved separation anxiety."

11. In response to concerns that the student showed autism-like symptoms, the evaluator noted that "there was no indication that student's behavior was on the PDD continuum." Rather, she noted "student is easily overwhelmed by demands that are beyond the level of his emotional development and his behavioral repertoire."

12. The evaluator found that "while he has made progress in academics achievement and language skills, the interventions provided thus far have minimally impacted student's more basic difficulties."

13. She recommended that he be placed in a classroom where those difficulties could be addressed, since this therapeutic environment would allow the student a safe environment in which to develop age appropriate skills and restructure his maladaptive defenses. The environment should also be able to individually meet his educational and intellectual needs.

14. On June 2, 2003, Dr. Elizabeth Barry Kravis MD conducted an evaluation (District 496). She found that the Ritalin trial had resulted in difficulty learning and memory loss. A trial on Adderall produced sleep problems, irritable behavior and decrease in appetite. A trial of Strattera produced a rash. Wellbutrin was finally tried, and produced no apparent side effects. The doctor noted that while it takes the edge off symptoms, it does not resolve them completely.

15. Less than a year later in March, 2004, another doctor (District 429) diagnosed student with ADD and Asperger's Syndrome, for symptoms including poor eye contact, stereotypic mannerisms, preoccupation, and poor social skills alongside normal intelligence. In (District 395), the same physician indicated that as of August, 2005 he was still following student for ADHD and Asperger's Syndrome, and treating him with Wellbutrin 75 mg. and Clonidine HCl. He also recommended an air conditioned bus for heat intolerance.

16. In June, 2004, student had a reading assessment at Easter Seals. (District 478). Based on the formal test results, the evaluator found he demonstrated the ability to read at a level appropriate for his age group.

17. Testing and evaluation continued, with a determination that student would be tested to confirm if he had an auditory processing problem on October 7, 2004. (District 413). He had the evaluation done at Easter Seals in October, 2004 (District 472; Parent 59-64).

18. A central auditory processing disorder (CAPD) assessment was completed by Dr. Jeanane Ferre on 2/28/05. (District 424, District 463 and Parent 65). The student was found to have normal peripheral auditory function, evidence of auditory decoding deficit, characterized by "inefficiency analyzing fine acoustic differences within the speech spectra. *** This inefficiency may impact on all types of language development including acquisition of age appropriate vocabulary, grammar or semantics.

19. The evaluator recommended modification of the environment to reduce extraneous noise, use of

preferential seating, repetition or rephrasing to enhance target signal, and the use of visual cues to clarify or complement the auditory target.

20. She also recommended the following direct interventions: aural rehabilitation to improve auditory perceptual and related skills, a multisensory explicit phonics based program such as Lindamood-Bell, Wilson
or Orton-Gillingham, seating the child near and facing the speaker, avoiding classroom settings that are noisy or reverberant, and repeating information as needed.

21. Student also had a physical therapy evaluation (District 426) on 2/24/05 and was referred for an assistive technology evaluation (District 454, 459-60). In the AT evaluation, the evaluator indicated that the student was able to work through noise and redirect after noisy interruptions. They recommended the continued use of visual cues in conjunction with new vocabulary or concepts; the use of a phonetic awareness/auditory discrimination program like Earobics or Lexia; preferential seating; and maintenance of consistent procedures and follow through.

22. Student had psychological testing done in April, 2006 (District 448; Parent 74) consisting of the WIAT-II. In that test, student scored as follows: Word Reading, 73; Reading Comprehension, 77; Pseudo word Decoding, 85; Spelling, 80; and written Expression, 86.

23. Student had psychological testing done by the school psychologist on April 2, 2007. (District 221; Parent 93). The school psychologist administered the Wechsler Individual Achievement Test-Second Edition (WIAT-II), with the following scored noted:

Wechsler Individual Achievement Test-Second Edition

|  | Standard Score | Grade Equivalent |
| --- | --- | --- |
| Numerical Operations | 96 | 4-6 |
| Math Reasoning | 104 | 5-4 |
| Reading Comprehension | 109 | 7-0 |
| Pseudo-Word Decoding | 102 | 4-6 |
| Word Reading | 72 | 2-5 |

Phonics-Based Reading Test (PRT)

|  | Standard Score | Grade Equivalent |
| --- | --- | --- |
| Decoding | 101 | 5.7 |
| Fluency | 85 | 2.6 |
| Comprehension | 118 | > 8.6 |
| Total Reading | 101 |  |

This evaluation was conducted over two days with one day assessing math and the next assessing reading. The evaluator's conclusions were that his math skills were "at or beyond grade level. Student was able to perform addition and subtraction problems with multiple digit numbers and regrouping. He was able to perform simple division problems (one digit numbers), single digit multiplication problems and subtraction problems involving fractions with the same denominator. ***"

She also found the test results indicated that his reading skills were at grade level or higher, but his word attack skills were inconsistent and may compromise comprehension in the classroom. Though she stated that his ability to comprehend passages may be fostered by a quieter environment, she also noted that the room in which he was evaluated was next to the main hallway and the noise was audible in the room.

24. The district paid for testing at Acacia Academy at the guardian's request. This testing was conducted April 19, 2007 (District 250). The evaluator administered the Wechsler Intelligence Scale for Children-Fourth Edition (WISC-IV), with results as follows:

Wechsler Intelligence Scale for Children – Fourth Edition
 (WISC-IV)

Verbal Comprehension Scale 99
Perceptual Reasoning Scale 112
Working Memory Scale 74
Processing Speed Scale 94
Full Scale 96

(IQ and Index scores have an average of 100 with 90 through 110 representing the average range)

|                   | Scaled Score |
| ----------------- | ------------ |
| Similarities      | 11           |
| Vocabulary        | 8            |
| Comprehension     | 11           |
| Digit Span        | 5            |
| Letter-Number     | 6            |
| Block Design      | 15           |
| Picture Concepts  | 11           |
| Matrix Reasoning  | 10           |
| Coding            | 7            |
| Symbol Search     | 11           |

(Subtest scaled scores have an average of 10 with 8 through 12 representing the average range)

The evaluator found that student's overall level of performance on the WISC-IV placed him in the average range of cognitive ability. She also noted some discrepancy on scores on the Verbal Comprehension and Perceptual Reasoning Scales, which suggested possible preference for using the visual/nonverbal channel of learning over the auditory/verbal channel of learning. Overall, she found that student's overall level of performance is typically associated with at least an average rate of academic achievement and good ability to apply abstraction and generalization to learning."

The evaluator found the test results suggested student had a strong ability to interpret and organize visual information in problem solving, and strength in spatial analysis/synthesis. In contrast, his visual analogical reasoning skills and his ability to make conceptual associations using picture cues are just average. His processing speed placed him in the average range of ability, as did his composite score on the verbal comprehension scale. According to the evaluator, when compared to other people his age, student demonstrates average development of his abstract verbal reasoning skills, his ability to apply verbal reasoning to a social context and his expressive vocabulary/word knowledge.

Student's thinking and reasoning skills were average, and his overall performance level is typically associated with an average rage of academic achievement and good ability to apply abstraction and generalization to learning.

Because his working memory skills appeared as a weakness relative to his average level of cognitive ability, the evaluator found that student may require the opportunity for the repetition of auditory information or the provision of visual cues to supplement his memory to enhance his functioning. The evaluator also noted that the difficulties student has in this area may take away from cognitive resources available for new learning.

24.  Numerous IEP and domain meetings have been convened on this student, including: 10/5/06, 10/26/06, 1/26/07, 4/2/07, and 6/14/07.

25. At the October 5, 2006 meeting, (District 306; Parent 130) the Easter Seals behavior specialists reported that "based on observation and consultation with Jan Kenny, no behavior intervention plan or functional behavior analysis is required at this time."

26. At the 4/2/07 IEP meeting (District 228, 230, 232) student was determined eligible for special education as a student with learning disabilities and multiple disabilities. He was found to no longer have an emotional disorder requiring special education services.

27. Because he has matured socially and improved academically, Easter Seals staff believes he has gotten

all the benefit out of Easter Seals that he can. .His teacher testified that his Easter Seals classmates are primarily low functioning children working on daily living skills, and that the primary focus is on therapeutics and not on academic instruction.

28. The guardian believes Easter Seals to be an inappropriate placement for student; the district does not dispute this. The dispute centers on what the appropriate placement is for this student. Guardian does not want to return student to the district schools. She proposed placements at Little Friends, Giant Steps, and out of district public schools. Most recently, she presented Acacia Academy as a proposed placement.  The district has proposed placement at a cross-categorical classroom at Meadowview School in the district.

29. Discussions regarding transition back to the home district began sometime around January, 2006 (District 358).

30. The guardian signed a Consent for Reevaluation 3/15/06 by guardian. (District 356)

31. A copy of the IEP report, procedural safeguards and ISBE 34-57F was provided to the guardian on 5/11/06. (District 354)

32. A notice of IEP meeting was sent to the parent on 9/21/06 for the 10/5/06 meeting. (Parent 122-123). A notice of IEP meeting and a copy of procedural safeguards was sent to guardian 10/16/06 for 10/26/06 meeting. (District 300).

33. Discussions on transition into the home district continued at the October 26, 2006 IEP meeting (Parent 42). The staff at Easter Seals indicated willingness to observe the programs recommended by the district. The guardian did not want student to return to Riverview. Other placements were recommended for the guardian to visit and observe. (District 529).

34. During a discussion of his progress at the 10/26/06 meeting, it was noted that student had met his goals of applying correct capitalization and punctuation at 80% accuracy; he hadn't met his goal of understanding the parts of speech. Math was at grade level. His social skills were greatly improved, and it was felt the student was capable of working independently. (District 304; parent 128).

35. An IEP meeting was convened January 26, 2007.(District 283, 288). At that meeting, the classroom teacher indicated that student had met the first two benchmarks in on his current IEP goal in math, and as a result additional IEP goals in math were proposed. The guardian wanted more academic instruction in math, which Easter Seals was finding difficult to provide since he was already in the highest academic functioning class in the program. Easter Seals said if student required more academic instruction, another educational setting might be more appropriate. since the focus was therapeutic at Easter Seals.

36.  In response to guardian's concerns regarding not using the district's curriculum in math, the teacher responded that the materials were too visually confusing for student so she used other materials to instruct him. The guardian agreed to have the IEP meeting notes forwarded to her via email.

37. The guardian also signed consent for reevaluation on 1/26/07. (Parent 48) The parent subsequently refused to meet with the social worker assigned to conduct the social developmental study, which was ordered to compare student's behavior to that of his same age peers to determine if a return to an in district program was appropriate. No social developmental study was conducted as a result. (District 528-29, 534-536; Parent 241).

38. Parent proposed placement at Little Friends. She also requested that the district pay for testing at Little Friends. The district agreed to testing with the following stipulations: "1) A release between Little Friends and the district needs to be signed by you so we can communicate with them about the testing; 2) Likewise a release between Easter Seals and Little Friends staff needs to be signed by you so they can communicate about student's school progress. 3) Little Friends staff will conduct an observation of student at Easter Seals as part of the evaluation. 4) The 60 day requirement for the evaluation needs to be waived by you as Little Friends has indicated to me that they may not be able to complete that evaluation within that time frame. 5) The district will continue to assess student in the areas identified in the last meeting. 6) All parties, Little Friends, Easter Seals, the district and you will discuss the results upon their completion at an IEP meeting. Finally we will not discuss an education placement for student nor will we send his records to any other private agency unless agreed upon at the next IEP meeting." The guardian later informed the district that she had looked at Little Friends and it didn't look like a good fit. (Parent 238). She then informed the district that because he was going to have medical testing done somewhere else in March, Little Friends wouldn't test him. (District 539; parent 239). Little Friends sent the district a letter indicating that the current classroom opening was not appropriate for the student.

(District 541).

39. A notice of IEP meeting was sent on March 22, 2007 for a meeting on April 2, 2007. (District 280).After the April 2 meeting, arrangements were made for testing to be done at Acacia Academy at district expense. Parent thought this meant the district agreed to place student there; district intended to evaluate Acacia as one of the possible placements for student. (District 521; parent 246; District 523; parent 245).

40. On May 16, 2007, the guardian was notified of the IEP meeting on June 14, 2007. (District 110). In the notification, it states the purpose of the meeting as "to review your child's eligibility for special education and related services; to review and/or develop your child's IEP and determine the child's educational placement; and, other--to review independent evaluation.

41. A letter was sent to the guardian with the IEP from April 2 and June 14, 2007 on June 18, 2007. (District 504). The IEP notes (District 76) indicate the June 14, 2007 meeting was a continuation of the April 2, 2007 meeting. Guardian, advocate, parent and the independent evaluator all participated in the June 14, 2007 IEP meeting; the evaluator participated via telephone primarily to give the results of the evaluation conducted at Acacia.

42. The IEE conducted at Acacia was reported on by Kathy Fouks, and progress on his IEP goals and objectives was reviewed. It was determined that reading and math goals had been met, so they wanted to develop new goals for reading, math and written language. It was reported that student could write a paragraph with multiple sentences, at least eight words per sentence, and that he was reading at a mid second grade level at 70 wpm and at beginning third grade level 67 wpm.

43. Possible placements were studied by the district. A placement at Acacia Academy was considered. (Dist. 077). There, instruction would be based on individual goals in skill based areas such as reading, math and writing in the morning, social studies, science and music in the afternoon. He would be in self contained class with the same group of about ten students, with one teacher and several aides. He would begin at a mid-second grade level reading utilizing Orton-Gillingham and teacher made materials developed with Wilson. Linda Mood Bell and graphic organizers would be used for reading comprehension. Project Write and the Read and Write program would be used for written expression. Linguis and Earobics would be used for auditory processing. Progress monitoring would include achievement subtests of the Woodcock Johnson.

44. The proposed district placement at Meadowview (District 65) would include placement in the cross categorical instructional program with 10 students in class, for 1475 mpw of instruction. It would include 60 mpw of pull out speech/language services, 30 mpw occupational therapy consult, 60 mpw social work, and a program aide. He would have three hours a day of literacy instruction including Reading Mastery and guided reading. For writing skills, they would use Six Trait writing methodology, along with Lexia, a computer based program for phonics and decoding, and Earobics would be available.  He would use Fast Math, a computerized program for math. He would participate in a weekly speech therapy group to develop pragmatics. The class would have one teacher and one assistant. Student would participate with typically developing peers for PE, music, health, art and other areas identified on his IEP.

45. Guardian and advocate objected to Meadowview because they believed he would be too easily distracted in the class. Members of the IEP team believed Acacia would be a lateral move for student because it is also a therapeutic school. The director of Acacia disagreed with its categorization as a therapeutic school. She said it was a private school that accepts learning disabilities approved for out of district placement, and that the label "therapeutic program" isn't used. Acacia is approved for students with learning disabilities, MR, speech/language disorders, emotional disabilities, other health impaired, autism and TBI. They also accept expelled students, court placed and unilateral parentally placed students. They have six to ten students per class, and though she testified they have 2-4 nondisabled students per class, the proposed placement for student was made up entirely of students with learning disabilities.

46. The guardian observed Acacia for one half a day; neither she nor the advocate ever observed the proposed placement at Meadowview.

47. Acacia Academy
would require a bus ride of approximately 21 miles each way; Meadowview is less than 5 miles away from student.

48. Notes for the IEP meetings were taken either by hand or via computer, and were provided to the guardian either via email or mail, or printed immediately after a meeting.

49. Guardian and advocate objected to PS drafting the goals; they wanted the Acacia Director to draft the goals instead. The Acacia Director didn't' agree with the goals presented, stating she thought they were "too high" based on her evaluation.

50. The parties disagreed on math goals for student. Guardian thought the proposed goals were not attainable, but (District 271) IEP goals from 2006 show almost all benchmarks were met and on the others he was making progress. For example, he could multiply 1 digit at 80% accuracy with assistance initially; then 2 digit by 1 digit independently with 80% accuracy was met during three of the four periods during the year. By the end of the year he was making progress on 2 digit by 2 digit. His math scores (District 258) on calculation were between 90-100; math fluency 85-90; applied problems 99-105, with an average being 100.

51. The Special Education Director SJ testified that there are currently 160 students placed out of district, with 2 placed at Acacia. She said they are placed out of district when their social, academic and emotional needs cannot be met in district.

52. SJ testified that student had reduced academic instruction at Easter Seals because of the service minutes he was getting. She said Easter Seals had helped him progress, but he was now ready to be challenged academically.

53. SJ said that at the June 14 IEP meeting, the team determined that both Acacia and Meadowview could meet his needs but the issue was which would provide the least restrictive environment for the student. If the parent disagrees, the school team makes the recommendation. Meadowview, Lincoln and Wesmere were all presented as possibilities to the family. The guardian spoke to an administrator at Lincoln, but never visited Meadowview or Wesmere.

54. The guardian and the family were upset when their desired placement at Acacia wasn't recommended. SJ said she believed the cross categorical instructional program was appropriate for the student. They had a research based curriculum with emphasis on reading and writing, and would allow student to be in his home community with opportunities typical elementary school provides.

55. Though guardian and advocate believe SJ falsified IEP notes and created three different versions of the IEP developed on June 14, 2007, SJ testified that she was cleaning them up, editing and finishing sentences to complete the document. An examination of the documents shows that there are minor differences between the IEP versions, but there are no substantive differences between the documents. It was common practice for the IEP notes to be revised based on comments from the guardian after the meetings.

56. The district's proposed placement, the cross categorical 4th and 5th grade class currently has 10 students ages 9-10. There is one full time teacher, one full time aide, and they are seeking a part time assistant. There is also a full time program aide.

57. The class includes two students with autism, 1 with MR, 1 with emotional disturbance, and 6 with speech/language disability. All the students in class are verbal, and none have behavioral issues. Student's abilities and goals were similar to those of students in her class.

58. In class, they use SRA reading along with Lexia, 30 minutes per day for phonemic awareness, phonics, and vocabulary. Progress is monitored weekly.

59. Class begins at 8:40 and ends at 3:30. Students start in homeroom if it is appropriate for them. At 9:37 the 4th graders leave for their specials. From 10:15 to 12:30 is literacy. At 12:37 4TH grade goes to lunch, and 5th grade continues literacy till 1:05, when 4th grade comes in for math and 5th goes to lunch. Finally, at 2:30. they have science and social studies. The aide goes to social studies and science with them but not math because they are all at grade level in math.

60. In the general education class homeroom, there are 26-27 in 4th grade and 28-32 in 5th. Meadowview has about 1,000 students, with about 100 students currently having IEPs. They have a social worker who comes weekly, one full time and one part time speech pathologist, and a full time occupational therapist. None of her students are receiving OT currently.

61. The school psychologist attended the domain meeting in January and the April and June IEP meetings. She conducted testing in math and reading, and found that student met the ISAT standard for both. During testing, he was pleasant, cooperative, and responsive to questions and age appropriate. In math

he showed average capability. In reading, he would sound words out three or four times to get the correct pronunciation, and could also extract meaning from a sentence when reading. She found that he had progressed emotionally, was improving academically and did not need a 1:1 aide any longer. She also did not believe Easter Seals was appropriate, nor that a private facility was the least restrictive environment for student. Further she thought that Meadowview would be an appropriate challenge.

62. The Director of Student Services for elementary level for the district was asked to facilitate the June IEP meeting due to tensions between SJ and the family. SJ took the notes for the meeting, reviewing them for clarity afterwards. She had no objection to family observing Meadowview, and she knew the student needed to transition. She found the cross categorical placement appropriate for student as well.

63. The guardian testified that she wanted student at Easter Seals back when he was in first grade, but that as long as two years ago she believed the placement to be inappropriate. She testified that the district supplied curriculum materials which Easter Seals was supposed to use, but credible testimony established that modifications were made because of the teacher's belief that the materials were too visually distracting for student.

64. Guardian testified that she wanted a neuropsychological test done on student and that it didn't get done because she didn't agree to the conditions the district placed on the testing. Evidence points to the fact, however, that the testing at Little Friends didn't get done because guardian decided she didn't want student placed there and decided to get testing somewhere else. Additionally, testimony at hearing established that Easter Seals staff didn't find the neuropsychological appropriate or necessary at that time because student wasn't having any behavioral issues.

65. Guardian testified that student has Asperger's syndrome, confirmed by doctor's reports. The behavior specialist who examined him disagrees, however. The guardian testified he is over stimulated with large numbers of students, loud noises and too much activity. She testified that he is easily distractible, doesn't play appropriately. These were her primary objections to Meadowview, though she never observed that classroom.

66. The guardian believes Meadowview is not less restrictive than Acacia. She testified she went to Lincoln Elementary to observe but wasn't allowed in the classroom; she testified she went to Riverview but student wouldn't go into the classroom to observe. She testified she never had the opportunity to visit Meadowview. Credible testimony including her own admission supports the fact that guardian opposed a return to the district in any form.

67. Though the guardian testified that all the IEPs were continued without reason, the evidence does not support this conclusion. The only multi-day IEP meeting appears to be the main one under discussion in the case which was begun April 2 and concluded June 14, 2007.

68. Guardian testified that IEP notes were routinely falsified with notes added after she left meetings. She also testified that SJ would have her sign "blank documents" all the time.

69. The program coordinator at Easter Seals attended five of student's IEP meetings. They held informal discussions about transition with DJ, MB KE and the guardian. Members of the IEP team were recommended transition because student's academic and social growth was beyond what they expected. Program coordinator admitted student stagnated at Easter Seals because they did not have the capacity to provide the academics he needed. She testified that a cross categorical program would be appropriate for him.

70. JK, the teacher and level coordinator at Easter Seals testified that guardian was concerned with student's academics and grade level at Easter Seals, but that she didn't want him in the district. She observed Meadowview and believes it to be an appropriate placement for him after working with him for two years at Easter Seals as his teacher.

**Conclusions of Law:**

**Free Appropriate Public Education**

Determining whether a student has received a FAPE begins with the two-prong analysis set out in *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley,* 458 U.S. 176 (1982) *("Rowley")*. First, the district must comply with IDEA's statutory procedures; second, it must develop an IEP reasonably calculated to

enable the student to benefit from the special education and related services. Additionally, the student must receive more than a nominal benefit from specialized instruction and related services. *T.H. v. Bd. of Educ. of Palatine Comm. Consol. Sch. Dist.*, 55 F. Supp. 830 (N.D. Ill. 1999). Further, minor procedural flaws or technical violations do not automatically require a finding that a district has denied the student a FAPE. *Heather S. v. State of Wise,* 125 F.3d 1045,46 (7th. Cir.1997). Thus, despite Guardian's argument to the contrary, the fact that the district did not file the due process complaint until three days outside the required five day timeline does not deny the student a FAPE. *Heather S., 125 F. 3d. 1045, 46 (7th Cir. 1997).*

According to 23 Il.Adm.Code 226.520, "The written notice a school district is required to provide to a parent prior to a proposal or refusal to initiate or change the identification, evaluation, or educational placement of, or the provision of FAPE to, a child shall conform to the requirements of 34 CFR 300.503. "Reasonable time", for purposes of 34 CFR 300.503(a), is defined as ten days. A parent may waive the ten-day notice period before placement, allowing the district to place the child in the recommended program as soon as practicable." (Source: Amended at 31 Ill. Reg. 9915, effective June 28, 2007). That notice must be provided whenever the public agency (1) Proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; or (2) Refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child. (Authority: 20 U.S.C. 1415(b)(3) and (4), 1415(c)(1), 1414(b)(1))

According to 23 Il.Adm.Code 226.530, With respect to parents' participation in meetings, school districts shall conform to the requirements of 34 CFR 300.322 and 300.501. For purposes of 34 CFR 300.322(a)(1), "notifying parents of the meeting early enough to ensure that they will have an opportunity to attend" shall mean notification no later than ten days prior to the proposed date of the meeting. In addition, the district shall take whatever action is necessary to facilitate the parent's understanding of and participation in the proceedings at a meeting, including arranging for and covering the expense of an interpreter for parents who are deaf or whose native language is other than English. (Source: Amended at 31 Ill. Reg. 9915, effective June 28, 2007)

It is clear that adequate parental notice, involvement and participation in planning the student's IEP is necessary to fulfill procedural requirements. *Alexis v. Bd. of Educ. For Baltimore Cnty. Pub. Sch.,* 40 IDELR 7 (Md. 2003). In this case, it is abundantly clear the guardian was more than adequately notified and involved in the formation of a free, appropriate public education for her grandson. She attended all the IEP meetings and actively participated in the student's education. She argues that the IEPs do not reflect her comments and concerns, and that notes were falsified. However, it is undisputed that she attended and participated in the student's IEP meetings, and signed all the IEPs.

Extensive email and written correspondence between the parties indicate guardian was informed and made aware of all IEP meetings in a timely manner as well as all decisions concerning the education of her grandson. Further, any discrepancies in the different versions of the June 14, 2007 IEP notes do not substantively impact on the meaning of those notes and therefore do not violate any procedural safeguards. Additionally, guardian's argument that the delay from June 14 to June 18 in sending out the IEP notes prejudiced her by giving her less time to consider the proposed placement does not hold up. Guardian was at the meeting where the placement was proposed, participated in the placement discussion, and voiced her opposition to it at that time. Further, June 14, 2007 was a Thursday. The notes were mailed out June 18, 2007 the following Monday. While she argues that she didn't have adequate time to consider the placement before being required to either accept it or file a due process request, it is abundantly clear from the record that she never intended to accept an in district placement. I find no procedural rights were violated; and if they were, they were minor technical or procedural flaws which did not impact on the provision of a free appropriate public education for her grandson.

Another of guardian's contentions is that the district did not evaluate the student in all areas of suspected disability, which resulted in an educational program that did not address all areas of the student's disabilities. A district must ensure that it recognizes a student's needs and completes a full and individualized evaluation.

 Kevin T. v. Elmhurst Comm. Sch. Dist. No. 205, 36 IDELR 153 (N.D. Il. 2002).  There is clear evidence in the record that the district did both. The student was evaluated numerous times in his short life, mostly at district expense. The district recommended a social developmental study to determine if student was at the same level as his age peers when they considered returning him to the district; guardian refused.

The evidence simply does not support the conclusion the guardian wishes. The student was evaluated numerous times from birth to the present date including psychological, neuropsychological, auditory processing, central auditory processing, OT, PT, and assistive technology evaluations. The guardian signed consents for these evaluations. There is no medical or other evidence to suggest that student's disabilities are anything other than what the district currently recognizes. Student is eligible to receive special education and related services under the Multiple Disabilities category due to learning disabilities, speech/language disabilities and other health impairments.

A student's intellectual potential must be considered in determining whether the student benefited from his educational program. *Kevin T. v. Elmhurst Comm. Sch. Dist. No. 205,* 2002 WL 433061 (N.D. Ill. 2002). Student's IQ is average. His math ability is average. His reading ability is average. His test scores have improved over the last year or two, showing marked improvement in several areas of reading and continued strong ability in math.

The adequacy of an IEP is determined at the time it is offered to a student, not at a later date. *O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233,* 144 F.3d 692 (10th Cir. 1998). Given the overwhelming evidence in the record and testimony at hearing in support of the June 14, 2007 IEP and recommended placement, it must be adjudged adequate for student and appropriate for his current educational needs.

An IEP must contain specific goals, and the goals and objectives must provide measurable criteria against which the student's achievement can be measured.  Independent Sch. Dist. No. 701, Hibbing Pub. Sch. v. J.T., 45 IDELR 92 (Minn. 2006) ("Hibbing"). The IEP developed by the team on June 14, 2007 provides just such goals and objectives alongside measurable criteria by which the student's achievements can be measured. (Dist. ?; Parent ?).

Guardian argues that the goals set in this IEP are "too high" and not achievable by her grandson. Guardian also argues that district knew for some time that Easter Seals was an inappropriate placement and did nothing about it. The IDEA mandates appropriate effort, not results. Carlisle Area Sch. Dist. v. Scott P., 21 IDELR 788 (M.D. Pa. 1994). The district recognized Easter Seals was inappropriate for student as early as January, 2006 when transition discussions began to be initiated. While guardian would like to blame the district for the fact that her grandson is still at Easter Seals, the blame cannot be laid at its door. The guardian has refused to explore in district placements, has refused to cooperate with the social developmental study, and refuses to accept the possibility that a more mainstream placement could be appropriate for her grandson.

The guardian appears to believe that the education her grandson would receive at Acacia would be superior to one received in the district. Her conclusion, however, is based on a half day visit to Acacia and no visit at all to Meadowview. While she may like some elements of Acacia's curriculum better, it is and remains the district's prerogative to determine methodology.  *Lachman v. East Maine Sch. Dist. 63*, 852 F.2d 290 (7th Cir. 1988). (when a proposed IEP is based upon accepted, proven methodology, a parent doesn't have the right to compel a district to provide a different methodology that the parent considers more appropriate.)

At the June 14, 2007 IEP meeting, three placements were considered. First, Acacia Academy (or another private therapeutic day school), which was rejected as being too restrictive; Second, the district's resource program which was rejected as not providing enough support; and third, the district's cross categorical instructional program, which was accepted by consensus of the IEP team. Guardian rejected this placement, and argues that placement at Meadowview in the district in a cross categorical classroom is not the least restrictive environment for student.

The least restrictive environment ("LRE") provision provides that "To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. "provision (Section 1412 (a)(5)(A); *see also Bd. of Educ. of LaGrange Sch. Dist. v. Ill. State Bd. of Educ.,* 184 F.3d 912, 915-16 (7th Cir. 1999)); *Bd. Of Educ. Of Chicago v. Ill. State Bd. Of Educ.46 IDELR 219 (ND IL 2006).*

The LRE is the one that allows the disabled child to be educated with her nondisabled peers, known as mainstreaming, to the greatest extent appropriate. *Beth B. v. Mark Van Clay 282 F.3rd 493, 496 (7th Cir. 2002).; Casey K. v. St. Anne Comm. High School District 302, 46 IDELR 102 (DC Central Dist. IL 2006).*

In this case, evidence supports the contention that student can be satisfactorily educated alongside his nondisabled peers in the district school setting. His test scores show average intelligence. His behaviors have extinguished to the point that he no longer needs a BIP or a 1:1 aide. He met his reading and math goals prior to the June 14, 2007 IEP meeting, necessitating that new goals be drafted. He was in the highest academic functioning class at Easter Seals and one of the highest functioning students overall. This student does not need another therapeutic placement like that he would find at Acacia surrounded primarily by other students with disabilities all day, far from home. This student needs to be educated alongside his nondisabled peers, neighbors, and friends in a school close to home where he can be academically challenged. The district's proposed placement offers such a setting.

### It is Ordered That:

1. The placement recommended by the student's IEP team at Meadowview in the cross categorical class room provides him with a free appropriate public education in the least restrictive environment.
2. The placement requested by the family at Acacia is not appropriate and is too restrictive based on the unique needs of this student.

### Right to Request Clarification:

Either party may request clarification of this decision by submitting a written request for such clarification to the undersigned hearing officer within five (5) days of receipt of this decision.  The request for clarification shall specify the portions of the decision for which clarification is sought, and a copy of the request shall be mailed to the other party(s) and the Illinois State Board of Education.  After a decision is issued, the hearing officer may not make substantive changes to the decision.  The right to request such clarification does not permit a party to request reconsideration of the decision itself, and the hearing officer is not authorized to entertain a request for reconsideration.

### Right to File Civil Action

This decision is binding on the parties unless a civil action is timely commenced.  Any party to this hearing aggrieved by this final decision has the right to commence a civil action with respect to the issues presented in the hearing.
Pursuant to ILCS 5/14-8.02a(i),that civil action shall be brought in any court of competent jurisdiction within 120 days after a copy of this decision is mailed to the parties.

The undersigned Hearing Officer certifies that she served copies of the aforesaid Decision and Order Parents and District, through counsel, and the Illinois State Board of Education at their stated addres depositing same with the United States Postal Service at Chicago, IL via certified mail, with postage prepa before 6:00 p.m. on November 9, 2007.

Dated this 9th day of November, 2007.

_____

LINDA MASTANDREA
HEARING OFFICER