## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **RICHARD PAUL E.**, a minor, and ) | |
| **ANNETTE S. B.**, individually and ) | |
| as his Guardian and Next Friend, ) | |
| ) | |
| Plaintiffs, ) | Case No. 07 C 6911 |
| ) | |
| v. ) | |
| ) | |
| ) | Magistrate Judge |
| **PLAINFIELD COMMUNITY** ) | Martin C. Ashman |
| **CONSOLIDATED SCHOOL** ) | |
| **DISTRICT 202**, ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM OPINION AND ORDER

On December 7, 2007, Plaintiffs, Richard Paul E. ("Paulie") and his guardian Annette S.

B. (the "Guardian") (collectively "Plaintiffs"), sued defendant, Plainfield Community

Consolidated School District 202 ("Defendant"), under 20 U.S.C. § 1415(i)(2) (2006) ,alleging

Defendant violated the Individuals with Disabilities Education Act (the "IDEA") 20 U.S.C. §

1400 *et. seq.* (2006). Defendant filed a motion for summary judgment ("Defendant's Motion") on

December 15, 2008. On January 12, 2009, Plaintiffs filed a motion for summary judgment

("Plaintiffs' Motion"). The parties consented to this Court's jurisdiction for any and all

proceedings in this case, including the entry of final judgment. *See* 28 U.S.C. § 636(c) (2006),

*and* Local Rule 73.1.  For the reasons stated below, the Court denies Plaintiffs' Motion and grants

Defendant's Motion.

## I.  Background

Before delving into the facts, it is helpful to provide a list of the individuals whose names appear in this discussion. After stating the individuals involved, the Court explains the facts relevant to this dispute.[1] The Court drew its facts from the administrative record, including the HO's decision, and the parties' statements of facts.

### A.  The Individuals Involved

Paulie is a twelve-year-old student with several disabilities. (Pls.' Statement of Facts ("SOF") ¶ 1; Def.'s Resp. to Pls.' SOF ¶ 1.) The Guardian is Paulie's grandmother and has been his legal guardian for ten years. (Pls.' SOF ¶ 2; Def.'s Resp. to Pls.' SOF ¶ 2.) Paulie lives with the Guardian and his mother, Stephanie E. (the "Mother"). (*Id.*) Gary Michaels ("Mr. Michaels") is the Guardian's parent advocate (Def.'s SOF ¶ 13.)

Defendant is a public school district[2] that educates pre-kindergarten through twelfth-grade students residing within its boundaries. (*Id.* at ¶ 3.) Janice Kenny ("Ms. Kenny") was one of Paulie's teachers at Easter Seals, a private, therapeutic day school located outside the District. (*Id.*

---

[1] Plaintiffs, in their responses to Defendant's statements of facts, "disputed" facts only by citing portions of the record; Plaintiffs did not explain why they disputed the facts. Local Rule 56.1(b)(3) provides that a party opposing a motion must file with the court a "concise response to the movant's statement that shall contain[] . . . *a response* to each numbered paragraph in the moving party's statement, *including*, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon[.]" (Emphasis added). Plaintiffs would have greatly aided this Court by filing *responses that explained why they disputed* particular statements, *in addition to including* citations to the portions of the record supporting their disputations. As a result of this failure, the Court could have deemed these responses admissions, but, in the interests of Paulie's education, it has not done so; instead, the Court dove headlong into the administrative record and never looked back.

[2] The Court will refer to the school district that Defendant oversees as the "District."

at ¶¶ 8, 12.) Samantha LeCrone ("Ms. LeCrone") is Paulie's special education teacher at his

current school, Timber Ridge Middle School. (Pls.' Resp. to Additional Facts ¶ 37; Def.'s SOF,

Ex. C at 2.) Susan Jawor ("Ms. Jawor") is the District's High School Director of Special Services

and former Assistant Director of Special Education. (Def.'s SOF ¶ 10.) Mary Ellen Bucci ("Ms.

Bucci") is the program coordinator at Easter Seals. (*Id.* at ¶ 16.) Kathy Fouks ("Ms. Fouks") is

the Principal of Acacia Academy (*Id.* at ¶ 21), a school located about twenty-one miles from

Paulie's home (R. at 10). Paulette Dominick ("Ms. Dominick") is the District's Special Education

Administrator. (Def.'s SOF ¶ 23.) Dawn Johnson ("Ms. Johnson") is the District's Special

Education Supervisor. (*Id.* at ¶ 23.) Patricia Snider ("Ms. Snider") is the District's Assistant

Superintendent for Special Education. (*Id.* at ¶ 23.) Shabona Masud-Khan ("Ms. Masud-Khan")

is the District's School Psychologist. (Pls.' SOF ¶ 102; Def.'s SOF ¶ 22.) Lori Okon ("Ms. Okon")

is a licensed clinical social worker. (Pls.' SOF ¶ 29; Def.'s SOF ¶ 23.) Dr. Jeanane Ferre ("Dr.

Ferre") conducted evaluations of Paulie. (Def.'s SOF, Ex. A at 4; R at 5.)  Dr. Doina Porumbescu

("Dr. Porumbescu") has a doctorate in clinical psychology and is a licensed school psychologist

and a professional counselor. (Pls.' Mot., Ex. 2 at 1.) Tammy Taylor ("Ms. Taylor") is a school

psychologist. (Pls.' Mot., Ex. 5 at 1.) Linda Mastandrea was the hearing officer (the "HO") in the

proceeding below. (Def.'s SOF ¶ 4.)


### B.    Paulie and His Disabilities

In his life, Paulie has undergone a significant amount of testing. (R. at 4-13.) From 2001 to

2007, Paulie underwent at least fifteen evaluations. (*Id.* at 2-7, ¶¶ 6-10, 14-18, 21-24, 42.) These

included speech and behavior tests, evaluations for Attention Deficit Disorder ("ADD"), Attention

-3-

Deficit Hyperactivity Disorder ("ADHD"), Asberger's Syndrome, autism, reading skills, reading comprehension, writing skills, auditory processing, physical therapy, as well as psychological an neurological examinations and in-school assessments of some of the aforementioned categories. (*Id.* at 4-12.)

Some of these tests revealed that Paulie was intellectually and academically competent (*Id.* at 4), though he displayed numerous problems, including an auditory decoding deficit (*Id.* at 5). Paulie also "tend[ed] to mistakenly aggravate peers, . . . engage[ed] in physical play, and ha[d] behavioral difficulties that make him vulnerable during transitions." (Def.'s Resp. to Pls.' SOF ¶ 17.)

Results also showed Paulie suffered from several disabilities, including learning disabilities in reading, written expression, speech, language, as well as other health impairments. (Def.'s SOF ¶ 7.) Although his IQ, as measured in 2007, was 96 (*Id.* at ¶ 11), Paulie has been diagnosed with the following disabilities: Central Auditory Processing Disorder ("CAPD"), ADD, symptoms of ADHD, and "Aspergers' Syndrome with symptoms of poor eye contact, stereotypic mannerisms, preoccupation, and poor social skills alongside normal intelligence" (Pls.' SOF ¶¶ 7-8, 11). Because of Paulie's disabilities, Dr. Ferre recommended a modified environment to reduce noise and accommodate Paulie's other symptoms. (*Id.* at ¶¶ 10-12.)

## C.    Paulie's Education and Individualized Education Plans

Paulie's education relevant to this dispute began when he attended first grade at Easter Seals in 2003. (Def.'s SOF ¶ 8.) Paulie attended Easter Seals from 2003 to 2008. (*Id.* at ¶¶ 9, 55.) While at Easter Seals in September 2003, Paulie "displayed significant behavioral difficulties."

(*Id.* at ¶ 9.) While he had trouble making friends during his time at Easter Seals, he attempted to

do so. (R. at 4.) He also generally had a good sense of humor and asked appropriate questions. (*Id.* at 4.)

Around January 2006, Paulie's behavior difficulties "extinguished." (Def.'s SOF ¶ 12.) Paulie's teachers at Easter Seals reported that he "[was] a pleasant, talkative, [and] happy boy." (R. at 4.) Although the parties dispute Paulie's improvements at Easter Seals, the HO found that, from 2006 to 2007, Paulie made academic improvements. (Def.'s SOF ¶ 10, Ex. A at 13-14; Pls.' Resp. to Def.'s SOF ¶ 10; R. at 14-15.) The HO found that Paulie had made marked improvement in reading and continued to perform well in math. (Def.'s SOF ¶ 10, Ex. A at 13-14; R. at 14-15.)

Because Paulie's behavior had improved, the school removed his one-on-one aide, and he performed well after this adjustment. (Def.'s SOF ¶ 12.) Indeed, Paulie became the highest functioning fifth-grader at Easter Seals. (*Id.*; Def.'s Resp. to Pls.' SOF ¶ 21.) Because Paulie no longer displayed behavioral difficulties in January 2006, expressed a desire to interact with students beyond those at Easter Seals, and demonstrated improvement, the Easter Seals staff recommended that he be placed outside the school. (Def.'s SOF ¶ 12.) In April 2006, Defendant evaluated Paulie and determined that Paulie had average math capabilities and a reading disability. (*Id.* at ¶ 19.)

Mr. Michaels, the parent advocate, testified that, around that time, the Guardian and Defendant had discussed a possible move from Easter Seals. (*Id.* at ¶ 13.) At an individualized education plan ("IEP") meeting on January 30, 2006, Defendant and the Guardian discussed Paulie's "growth and transition back into his home school." (*Id.* at ¶ 13.) This topic yielded numerous other IEP meetings, including those on October 5, 2006; October 26, 2006; January 26,

2007; April 2, 2007; June 14, 2007; and October 14, 2008. The Guardian participated in, or had

the opportunity to participate in, all of these meetings.[3] (R. at 14; Def.'s SOF ¶ 15.)

At the next IEP meeting on October 5, 2006, two behavior specialists at Easter Seals reported that Plaintiffs did not need an individual Behavior Intervention Plan ("BIP"). (Def.'s Resp. to Pls.' SOF ¶ 43.) Also, sometime prior to October 26, 2006, the Guardian told Ms. Okon, a licensed clinical social worker, that she felt that the Defendant might be attempting to place Paulie into the District's schools before he was ready. (*Id.* at ¶ 30.) Then, at the October 26, 2006, IEP meeting, Ms. Okon questioned the goals developed by the IEP team (*Id.* at ¶ 31), asserting that the goals appeared inattentive to Plaintiffs' desire to improve Paulie's reading skills, and that the IEP was otherwise insufficient. (*Id.* at ¶ 32.) Ms. Okon further testified that Easter Seals did not challenge Paulie academically. (*Id.* at ¶ 40.)

At the January 26, 2007, IEP meeting, Defendant discussed the possibility of the Guardian visiting Easter Seals and set goals for Paulie. (Def.'s SOF ¶ 17.) In the spring of 2007, after discussing these and other concerns with the Guardian, Defendant examined Meadowview Elementary School as a possible placement for Paulie. (*Id.* at ¶ 18.) Defendant also considered cross-categorical placement at Lincoln and Wesmere schools, but, because the class sizes at those schools increased, Defendant considered Meadowview, with its smaller size, a more appropriate environment. (*Id.* at ¶ 18.)

---

[3] Plaintiffs assert that Defendant prevented the Guardian from fully participating in the most recent IEP meeting on October 14, 2008. (Pls.' Resp. to Def.'s SOF ¶ 15.) The record indicates that the Guardian rescheduled this meeting, attended it, and had to leave early. (*Id.*, Ex. 8 at 18-21.)

Several months later, on March 1, 2007, the Guardian sent Ms. Jawor, the District's High

School Director of Special Services, an e-mail suggesting Acacia Academy as a possible

placement for Paulie. (R. at 366.) On or around March 28, 2007, Ms. Jawor sent an e-mail to the

Guardian indicating Defendant would not be inviting Acacia to the April 2, 2007, IEP meeting,

but would consider Paulie's placement at that school during the IEP meeting. (Def.'s Resp. to Pls.'

SOF ¶ 45; R. at 371.) The meeting was held on April 2, 2007, and, at its conclusion, the Guardian

requested, and Defendant agreed, that Paulie undergo an Independent Educational Evaluation (the

"IEE"). (Def.'s SOF ¶ 20.) At first, the Guardian requested that the IEE take place at Little

Friends, a school she had previously suggested as a possible placement. (*Id.*) Soon after, however,

the Guardian decided against pursuing Little Friends as an option. (*Id.*) Instead, she requested the

evaluation take place at Acacia Academy. (*Id.* at ¶ 21.) Defendant agreed to conduct the

evaluation there and cover its cost. (*Id.*)

At Acacia, Paulie would receive morning instruction in skill-based areas such as reading,

math, and writing. (R. at 9-10.) He would use "Orton-Gillingham" and teacher-made materials for

reading; "Mood Bell and graphic organizers" for reading comprehension; the "Project Write and

the Read and Write programs" for written expression; Linguis and Earobics for auditory

processing ; and "Woodcock Johnson" for progress monitoring. (*Id.* at 10.) In the afternoon, he

would have instruction in social studies, science, and music. (*Id.*)

Between February and March of 2007, Ms. Masud-Khan evaluated Paulie on two

non-consecutive days at Acacia, assessing math skills one day and reading skills the other day.

(*Id.* at 693-94.) She found that Paulie's math and reading skills were at or beyond grade level. (*Id.*

at 694.) Her summary finding was that Paulie's "achievement scores [are] within the average to

higher than average range in the areas of reading and math skills." (*Id.*) She also found that Paulie
had difficulty with "comprehension in the classroom," and that "his speed of silent reading [may]
be compromised by noise factors." (*Id.*) As a result, Ms. Masud-Khan concluded that Paulie did
not require placement in a private facility. (Def.'s SOF ¶ 22.)

On May 16, 2007, Defendant notified the Guardian of an IEP meeting that would be held
on June 14, 2007. (R. at 9.) The notice stated that "the purpose of the meeting [was] 'to review . . .
[Paulie's] eligibility for special education and related services; to review and/or develop . . .
[Paulie's] IEP and determine . . . [his] educational placement; and . . . to review independent
evaluation.[']" (*Id.*) The following people attended the June 14, 2007, IEP meeting: the Guardian,
Mr. Michaels, Ms. Okon, the Mother, Ms. Johnson, Ms. Snider, Ms. Bucci, Ms. Kenny, Ms.
Dominick, Ms. Jawor, and Ms. Fouks (who participated by phone). (Def.'s SOF ¶ 23.) Ms. Jawor
testified that everyone at the meeting worked cooperatively, and Mr. Michaels stated that
everyone present had the opportunity to ask questions. (*Id.* at ¶ 24.) During the meeting, the IEP
team discussed goals involving current speech and language, occupational therapy ("OT"), and
social work. (*Id.* at ¶ 25.) Ms. Dominick stated that, to achieve these goals, the IEP should set
them "ambitiously." (*Id.* at ¶ 26.) Because the Guardian wanted Paulie to improve his reading
skills, Defendant proposed high reading standards for him. (Def.'s SOF ¶ 27.) Notes were taken by
hand or on the computer during the meeting. (R. at 10, ¶ 48.) The Guardian never expressed
concern over the service minutes of the IEP meeting. (Def.'s SOF ¶ 27.)

During the meeting, Ms. Snider, Ms. Dominick, and Ms. Jawor asked Ms. Fouks if she felt
the proposed goals were appropriate. (*Id.* at ¶ 28.) Ms. Snider repeated several goals to ensure Ms.
Fouks could hear and comment on them. (*Id.*) Ms. Snider and Ms. Dominick do not recall Ms.

Fouks voicing any objections, and Ms. Fouks testified that Defendant allowed her to participate in the meeting. (*Id.*) Ms. Jawor testified that, although "both the [D]istrict and Acacia had programs that could meet Paulie's needs," the IEP team needed to decide "which [school] would be the least restrictive environment for him." (Def.'s Resp. to Pls.' Additional Facts ¶ 14.)

Regarding Paulie possible placement at Acacia, a school located twenty-one miles from Paulie's house (R. at 10), Ms. Fouks testified that Paulie would be placed in a classroom comprised entirely of disabled students, aged nine through eleven (Def.'s SOF ¶ 36). She also stated that seventy-five to eighty percent of Acacia's students are learning disabled. (*Id.* at ¶ 37.) Ms Fouks testified that the remaining students at Acacia have a different disability, have been expelled from public schools, or have been placed in the school by the juvenile court system. (*Id.*; R. at 10.) Although all of the students in Paulie's class were disabled, Acacia's typical classrooms contain between six and ten students, out of which two to four are disabled. (R. at 10.) In contrast to Meadowview, "Acacia does not offer any after-school sports programs or any non-academic school programs and its only extracurricular music program is 'guitar.'" (Def.'s SOF ¶ 39.)

Ms. Jawor testified that the in-District placement could provide Paulie with the curriculum he needed to succeed, including time and programs to enhance his reading and writing skills. (Def.'s SOF ¶ 41.) Additionally, she testified that placement in the District, because of its proximity to Paulie's home, provides neighborhood opportunities that private institutions, like Acacia, lack. (*Id.*)

In addition, Ms. Masud-Kahn testified that Paulie's placement at Acacia would be inappropriate because he no longer had an emotional disability. (*Id.* at ¶ 42.) Others also expressed concern over Paulie's placement at Acacia. Ms. Kenny testified that Acacia is a

geographically "isolated school," and, as a result, any friends Paulie made would likely live far away. (*Id.* at ¶ 43.) According to Ms. Kenny, because of its location, Meadowview would allow Paulie to see his friends more often. (*Id.*) She further opined that Meadowview's cross-categorical instruction would be a good placement for Paulie. (*Id.*) Ms. Bucci expressed similar optimism about Paulie's placement at Meadowview, testifying that cross-categorical instruction at Meadoview would benefit Paulie and provide him with the socialization he needed. (*Id.* at ¶ 44.)

Mr. Michaels focused on the negatives of Acacia rather than the positives of Meadowview, probably because he did not visit Meadowview or observe Paulie while he attended Easter Seals. (*Id.* at ¶ 45.) He testified that Acacia's curriculum would be foreign to Paulie, and, although he maintained that Paulie should not be placed in another therapeutic day school, he did not identify Acacia as a therapeutic school. (*Id.*; Def.'s Resp. to Pls.' SOF ¶ 128.)

Because most of the IEP team opined that Acacia would be inappropriate, Defendant formally offered to the Guardian an in-District placement at Meadowview during the June 14, 2007, IEP meeting. (Def.'s Resp. to Pls.' SOF ¶ 47.) Meadowview Elementary was located three to five miles from Paulie's home. (Def.'s SOF ¶ 31.) At Meadowview, "Paulie would be mainstreamed, [would be] assigned to regular general education homeroom[,] and would attend special classes like art, music, and physical education with his non-disabled peers." (*Id.* at ¶ 32.) Paulie also would attend lunch and recess with non-disabled students. (*Id.*)

Paulie would attend his academic courses "in a cross-categorical setting classroom, consisting of one teacher, one aide, and ten to thirteen fourth[-] and fifth[-]grade . . . students, ranging from ages nine to ten, . . . .all [of whom] receiv[e] special education services." (*Id.* at ¶ 33; R. at 11.) The students in Paulie's proposed non-mainstreamed classes all exhibited abilities

and goals similar to Paulie. (R. at 11.) Paulie's homeroom class would contain between twenty-six and thirty-two students for fourth and fifth grade. (*Id.*) During the meeting, Defendant informed the Guardian that Paulie's fourth-grade classes at Meadowview could contain a maximum of twenty-seven students. (Def.'s Resp. to Pls.' Additional Facts ¶ 21.) The IEP stated that most of his classes would contain ten students but could increase to thirteen students. (R. at 185.) The HO found, and the IEP states, that Paulie's IEP at Meadowview would include specific amounts of speech and language services (including speech therapy), occupational therapy, social work, and a program aide. (*Id.* at 10, ¶ 44.) The IEP for Meadowview also included "three hours a day of literacy instruction including Reading Mastery and guided reading"; "Six Trait writing methodology, along with Lexia, a computer[-]based program for phonics and decoding" for writing skills; and "Fast Math, a computerized program[,] for math." (*Id.*, ¶ 44; *Id.* at 185-86.)

The IEP team members from Easter Seals and the District agreed that cross-categorical instruction within the District was appropriate. (Def.'s SOF ¶ 40.) Additionally, the extracurricular activities Defendant offered allowed all students, disabled and non-disabled, to participate. (*Id.* at ¶ 34.) Defendant did not object to the Guardian observing Meadowview. (*Id.* at ¶ 35.)

Although the Guardian acknowledged that the District's special education programs emphasize academics more than those at Easter Seals (*Id.* at ¶ 46), she expressed concerns over academics and class sizes at Meadowview (*Id.* at ¶¶ 46, 49). These concerns did not go unaddressed. Ms. Jawor testified that Defendant would start Paulie in a mainstream classroom for non-academic classes only. (*Id.* at ¶ 49.) Paulie would not be mainstreamed into general education academic classes until all parties felt that he could make the successful transition. (*Id.*) Although

-11-

the Guardian objected to this placement, she never observed Meadowview and opposed a return to the District "in any form." (R. at 12, ¶ 66.)

At the conclusion of the meeting, Ms. Jawor gave the Mother a copy of the IEP, three pages of IEP notes, and three pages of the goals and objectives discussed at the meeting. (Def.'s Resp. to Pls.' Additional Facts ¶ 12.) After the meeting, Defendant revised the notes and included the Guardian's comments, as was common practice. (R. at 11.) On June 18, 2007, Defendant sent the Guardian a finalized copy of the IEP from the June 14, 2007, meeting. (*Id.* at 9.) This IEP noted that the June 14, 2007, meeting was a continuation of the April 2, 2007, IEP meeting. (*Id.*) The finalized copy also contained some edits made by Defendant. (Def.'s Resp. to Pls.' Additional Facts ¶ 21; *compare* R. at 744 *with* R. at 715.) These edits revised the total number of students allowed in Paulie's class from seventeen to twenty-seven, and revised the related services provided to include a program aide (which was not stated in the unrevised IEP notes handed to the Mother). (Def.'s Resp. to Pls.' Additional Facts ¶ 21; *compare* R. at 744 *with* R. at 715.) Defendant stated that the IEP notes handed to the Mother were "part of the [unfinished] copy . . . , and the District indicated to [the Mother] that [it] [was not] finished completing them." (Def.'s Additional Facts ¶ 12.) Defendant claimed the change in class size resulted from a typographical error, though it did not directly address the change regarding the program aide. (*Id.* at ¶ 13.) The HO found that "there are minor differences between the IEP versions, but there are no substantive differences between the documents." (R. at 11.)

### D. The Due Process Hearing and the Hearing Officer's Decision

The June 14, 2007, IEP placed Paulie at Meadowview. Because the Guardian wanted Paulie to attend Acacia, she requested a due process hearing. (Def.'s SOF ¶ 51.) The hearing took place from October 22, 2007, to October 23, 2007. (R. at 1075-1263; Def.'s SOF ¶ 53.) Twelve witnesses testified at the hearing, and Plaintiffs, who presented seven witnesses, had the opportunity to cross-examine all of Defendant's witnesses, as well as re-direct and re-cross all witnesses. (Def.'s SOF ¶ 54.) Plaintiffs raised three issues before the HO: (1) "[w]hether . . . [Defendant] failed to evaluate the full nature and extent of . . . [Paulie's] disability"; (2) "[w]hether . . . [Defendant] failed to allow the [G]uardian to fully participate in the formation of a free, appropriate public education for the student"; and (3) "[w]hether . . . [Defendant] failed to provide . . . [Paulie] with an IEP [that] was reasonably calculated to provide a free, appropriate public education." (R. at 3.)

The HO issued her opinion on November 9, 2007, rejecting all of Plaintiffs' arguments and finding that Paulie's placement at Meadowview was appropriate. (R. at 16-17.) Acacia, the HO found, was not appropriate and was too restrictive. (*Id.* at 16.) The HO also made extensive factual findings. (*Id.* at 4-13.) As to her legal conclusions, the HO stated that Defendant satisfactorily and fully evaluated Paulie's disability. (*Id.* at 14.) She concluded that "[t]here is no medical or other evidence to suggest that [Paulie's] disabilities are anything other than what . . . [Defendant] currently recognizes." (*Id.*) The HO rejected Plaintiffs' argument that the Guardian did not participate fully in the development of Paulie's IEP, stating that "it is abundantly clear [that] the [G]uardian was more than adequately notified and involved in the formation of a free, appropriate education for her grandson. (*Id.*) The HO observed that the Guardian attended all the

-13-

IEP meetings and fully participated in them. (*Id.*) As a result, the HO found that no procedural violations occurred, and, if they did, she found them not to impact Paulie's free appropriate public education. (*Id.*) With respect to the adequacy of Paulie's IEP, the HO concluded that the IEP contained the appropriate goals and objectives. (*Id.* at 15.) Finally, the HO concluded that Paulie's placement satisfied the LRE requirement because it "educated [Paulie] alongside his non[-]disabled peers, neighbors, and friends in a school close to home [that] . . . challenged" him academically. (*Id.* at 16.) Dissatisfied with this result, Plaintiffs filed a complaint in the United States District Court for the Northern District of Illinois on December 7, 2007.

### E. The 2008 Settlement and Paulie's Experiences at Acacia and Timber Ridge

Later, on May 13, 2008, the parties agreed to a settlement (signed July 2, 2008) ("2008 Settlement Agreement"), which stipulated that Paulie would attend Acacia Academy at Defendant's expense for six weeks (June 16–July 28) during the summer of 2008. (Def.'s SOF ¶ 55, Ex. C at 1.) At the end of the summer, Paulie would enroll in and attend Timber Ridge Middle School, which was located approximately two miles from his home and was his "stay put" placement under the IDEA. (*Id.* at ¶¶ 56, 59; *see* 20 U.S.C. § 1415(j).) The 2008 Settlement Agreement also required Plaintiffs to dismiss with prejudice their federal complaint "[i]f the IEP team recommends that Paulie remain at Timber Ridge, and [the Guardian] agrees with the IEP team's recommendation." (Def.'s SOF, Ex. C at 3.)

On June 26, 2008, Ms. Fouks evaluated Paulie at Acacia and concluded his academic skills were significantly below average. (Def.'s Resp. to Pls.' SOF ¶ 13.) In this assessment, Ms. Fouks also concluded that, relative to his peers at the same grade level, Paulie performed

-14-

below average in reading skills, reading comprehension, mathematics, and math calculation skills, broad reading, basic writing skills, written expression, and his knowledge of phoneme-grapheme relationships. (*Id.*) Ms. Fouks further concluded that Paulie demonstrated significant relative weakness in written language, and, when a selected set of achievement areas are compared, he demonstrated significant relative strength in oral language. (Pls.' SOF ¶ 15; Def.'s Resp. to Pls.' SOF ¶ 15.) She also concluded that Paulie's academic knowledge is average, and "[his] fluency with academic tasks and his ability to apply academic skills are both within the low average range." (Pls.' SOF ¶ 13, Ex. 6 at 1; Def.'s Resp. to Pls.' SOF ¶ 13)

In addition to Ms. Fouks' evaluation, Dr. Porumbescu observed Paulie a total of eight times: four times at Acacia and four times at Timber Ridge. (Pls.' Mot., Ex. 4 at 1.) Each observation lasted between one hour and two and one-half hours. (*Id.*) Based on these observations, Dr. Porumbescu stated that Paulie displayed difficulty interacting socially, which "appeared to be magnified in the larger school setting." (*Id.* at 19.) Dr. Porumbescu stated that, "[i]n the public school setting, Paulie was teased, made fun of, and taken advantage of during class, and ostracized in the cafeteria." (*Id.*) Paulie also was teased at Acacia (*Id.* at 3), and had no interaction with non-disabled peers (*Id.* at 3-8). Furthermore, Dr. Porumbescu never evaluated Paulie during a lunch period at Acacia. (*Id.* at 1.)

Dr. Porumbescu also conducted evaluations of Paulie's on- and off-task behavior, which consisted of observing Paulie and a random student for fifteen minutes and recording behavior at one minute intervals. (*Id.* at 6, 13-16.) This was done a total of five times: once at Acacia and four times at Timber Ridge. (*Id.*) At Acacia, Paulie's behavior was not compared to a random student, and he was off-task seventeen percent of the time. (*Id.* at 6.) During the four observations at

-15-

fifteen, thirteen, and fifty-five.[4] (*Id.* at 13-16.)

Ms. Taylor, another psychologist, also observed Paulie at Acacia. Her report indicates three observations: July 11, 2007; July 14, 2007; and July 28, 2007. (Pls.' Mot., Ex. 5 at 1.) Each observation lasted a total of two hours. (*Id.* at 1, 4, 6.) Her report details Paulie's behavior and interaction within each two-hour interval. During Ms. Taylor's second observation, she commented that "Paulie appears more willing to engage in conversation with another boy who appears to have a similar level of social functioning as he does." (*Id.* at 5.) During her observation on July 14, 2007, Ms. Taylor observed Paulie for a fifteen-minute interval in which she noted Paulie was off-task eleven percent of the time (compared to zero percent for the other student she observed). (*Id.* at 5.) No clinical or other findings were made, and the remaining portions of the report are unremarkable.

While Paulie's classroom at Acacia contained only seven students, all of whom were disabled. (Def.'s Resp. to Pls.' Additional Facts ¶ 40.) Nevertheless, Paulie made some gains at Acacia, improving his scores in several tests administered to him. (*Id.* at ¶ 38.)

Although Paulie's IEP specified that his class size at Meadowview would range from ten to thirteen students, his academic courses at Timber Ridge had between thirteen and fifteen students. (Def.'s SOF ¶ 56, Ex. D at 3.) Other classes, such wood shop and physical education, included as many as twenty-eight students. (*Id.*) Defendant maintains class size varies because the April 2, 2007/June 14, 2007, IEP summary–to which the 2008 Settlement required adherence–governed

---

[4] The random students against whom Paulie's behavior was compared exhibited the following percentages of off-task behavior: .67, .02, twenty-four, and twenty-seven. (R. 13-16.)

only elementary school placement. (*Id.*) The 2008 Settlement Agreement also required Defendant to provide Plaintiffs with cross-categorical instruction for all academic classes and mainstreaming for physical education, "Encore," and lunch. (Def.'s SOF ¶ 56, Ex. C at 2.) Additionally, it required Defendant to provide Paulie with a separate changing area, and did not require Plaintiffs to shower, during physical education at Timber Ridge. (*Id.*; Def.'s SOF ¶ 61.) Defendant's compliance with these latter two provisions is not disputed.

At Timber Ridge, Paulie has earned all passing grades, including two "As," three "Bs," and one "C." (Def.'s SOF ¶ 63; Pls.' Resp. to Additional Facts ¶ 49.) Paulie's teachers report that he "enjoys participating in class discussions and reading aloud." (Pls.' Resp. to Additional Facts ¶ 19.) Paulie's social worker reports that, while Paulie needs "practice and repetition," he is generally doing well. (*Id.* at ¶ 23.) His occupational therapist has not reported any problems and stated that Paulie's teachers conclude he is proceeding satisfactorily in classes with fine motor and sensory skills. (*Id.* at ¶ 27.) His special education teacher, Ms. LeCrone, believes that Paulie has progressed considerably, and that Acacia's placement would be "too limiting." (*Id.* at ¶ 37.) Additionally, no staff member at Timber Ridge sensed that Paulie harbored any fear regarding his placement or experience at Timber Ridge. (*Id.* at ¶ 31.) Although the Guardian has complained of "a few incidents," Paulie never has complained of being bullied or abused at Timber Ridge. (*Id.* at ¶¶ 55-56.)

Plaintiffs submitted additional evidence about Paulie's experience at Timber Ridge. Some of this evidence has been discussed.[5] Among this evidence is a police report from October 6,

_____

[5] The supplemental evidence this Court received included the following: Dr. Porumbescu's Confidential Report, Dr. Porumbescu's resume, Tammy R. Taylor's Observation
(continued...)

2008, indicating Paulie had been struck by another student who exhibited "sensory tendencies."

(Pls.' Mot. for Supplemental Evidence, Ex. 1.) Also included in this evidence is Defendant's report of an incident that occurred in a bathroom on January 23, 2009. Defendant's report included a description of the incident, as well as interviews with students and teachers. Interviews with these teachers revealed that "a couple of students came to her and stated that Paulie was in the bathroom with his pants down, making monster noises, chasing them with his arms in the air." (Def.'s Report at 1.)

A teacher spoke to Paulie after the incident and informed him that "making monster noises and gestures would make other kids feel uncomfortable." (*Id.*) She also asked Paulie why his pants were down and he told her they had fallen. (*Id.*) The teacher discussed possible solutions with Paulie, such as using the stall, and he returned to class. (*Id.* at 2.) Only one identified student could relay any information of the bathroom incident to teachers or staff. (*Id.*)

Other than this incident, Paulie has been reported as "very polite," doing "a great job of saying please and thank you." (Pls.' Resp. to Additional Facts ¶ 50.) He also allowed other students to borrow materials, obeyed orders, socialized with other students, and displayed a command of social courtesies. (*Id.* at ¶¶ 50-53.) Paulie has been "working well and participating with the general education students." (*Id.* at ¶ 53.) He has even helped other students in math class while working in a small group. (*Id.* at ¶ 54.)

---

[5](...continued)
report, Ms. Fouks' evaluation, the Parent/Guardian Comment to the October 14, 2008, IEP meeting, the Mother's cell phone records, a police report, additional school records (including e-mails between the Guardian, Defendant, and their respective representatives), and Defendant's report of an incident involving Paulie in the bathroom at Timber Ridge.

Pursuant to the 2008 Settlement Agreement, Defendant held another IEP meeting, on October 14, 2008, which the Guardian attended. (Def.'s SOF ¶ 58, Ex. C at 2.) Plaintiffs, however, are not satisfied with the results of that meeting or Paulie's continued placement at Timber Ridge. Therefore, they pursued their cause of action stated in their previously filed complaint.

## II. **Standard of Review**

Before articulating the arguments and legal principles applicable to this case, the Court must explicate the standard of review. The IDEA authorizes aggrieved parties to file suit in federal court, essentially allowing parties to appeal decisions made by hearing officers. 20 U.S.C. § 1415(i)(2). This provision of the IDEA also provides that "the court [in which the suit is filed] (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(i)-(iii).

These proscriptions differ substantially from those for a motion for summary judgment under Federal Rule of Civil Procedure 56. *Compare* FED. R. CIV. P. 56 and with 20 U.S.C. § 1415(i)(2)(C)(i)-(iii). As a result, the typical standard for summary judgment does not apply in cases brought under the IDEA. *Evanston Cmty. Consol. Sch. Dist. No. 65 v. Michael M.*, 356 F.3d 798, 802 (7th Cir. 2004). Under the IDEA, the district court reviews the hearing officer's decisions of law de novo. *Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist No. 221*, 375 F.3d 603, 611 (7th Cir. 2004). As to the issues of fact, the district court must give "due weight" to the hearing officer's decision. *Id.* at 612. What constitutes "due weight" depends on whether the district court receives new evidence. *Id.* If the district court receives no new

-19-

evidence, summary judgment acts as a "procedural vehicle for asking the judge to decide the case

on the basis of the administrative record." *Michael M.*, 356 F.3d at 802. In such a case, the

district court can reverse the hearing officer's decision "only if it is 'strongly convinced that the

order is erroneous,'" a benchmark similar to the substantial evidence standard of review that

governs other administrative appeals. *Alex R.*, 375 F.3d at 612 (quoting *Sch. Dist. v. Z.S.*, 295

F.3d 671, 675 (7th Cir. 2002)).

If, however, the district court takes new evidence, the standard of review may become

less deferential. *Id.* The Seventh Circuit has delineated a sliding scale approach to this issue:

"[t]he more . . . the district court relies on new evidence, . . . the less it should defer to the

administrative decision . . . ." *Id.* Even so, if a court take on mounds of new evidence, it should

proceed vigilantly to avoid legal error: the district court must consult the administrative record

and cannot conduct a trial de novo. *Id.* Regardless of the amount of new evidence the district

court receives, the party challenging the decision has the burden to show that the preponderance

of the evidence did not support the hearing officer's decision. *Michael M.*, 356 F.3d at 802.

This standard emphasizes the limited role courts should play in deciding educational

policy or making educational judgments. *Id.* ("The district court. . . must not substitute its

'notions of sound educational policy' for those of the school district." (quoting *Heather S. ex rel.

Kathy S. v. State of Wis.*, 125 F.3d 1045, 1053 (7th Cir. 1997))). The Supreme Court has

cautioned against judicial involvement in educational matters because "courts lack the

'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of

educational policy.'" *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176,

208 (1982) (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42 (1973)).

Although absolute deference to the school district would render the IDEA nearly meaningless, the standard of review under the IDEA affords the schools more deference than in other cases. *Compare Michael M.*, 356 F.3d at 802, *with Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 127 S.Ct. 2738, 2766-68 (2007) (noting that a deferential standard is not always appropriate, and, in previous cases involving the Equal Protection Clause, courts used such deference to maintain segregation and segregationist policies).

The Court holds close to its judicial bosom these deferential principles when deciding this case. Although this Court has received some new evidence and will weigh its decision accordingly, the majority of the evidence in this case emanates from the administrative record. As a result, the Court relied mostly on the evidence in the administrative record when making its decision. As the parties challenging the HO's decision, Plaintiffs must "strongly convince" this court that the HO's decision was erroneous.

## III. Discussion

The IDEA has two basic components: a substantive component and a procedural component. The IDEA's substantive component requires all public school districts to provide to children with disabilities between the ages of three and twenty-one "[a] free appropriate public education" ("FAPE"), 20 U.S.C. § 1412(a)(1)(A) (2006), in the "least restrictive environment" ("LRE"). 20 U.S.C. § 1412(a)(5)(A). To accomplish this goal, the IDEA's procedural component requires States to provide disabled children and their parents "guaranteed procedural safeguards with respect to the provision of a free appropriate public education." 20 U.S.C. § 1415(a).

Not surprisingly, then, the Supreme Court has held that the reviewing court must undertake a two-part inquiry to determine whether a school district complied with the IDEA. First, the state must comply with the procedures set forth in the IDEA. *Rowley*, 458 U.S. at 207. Second, the state must develop an IEP through "the [IDEA's] procedures [that is] reasonably calculated to enable the child to receive educational benefits." *Id.* at 207.

While Plaintiffs make several arguments that Defendant failed the *Rowley* test,[6] the Court addresses only those arguments raised before the HO; Plaintiffs waived their remaining arguments, which they raised for the first time before this Court. *Bd. of Educ. of Cmty. Consol. Sch. Dist. No. 21 v. Ill. State Bd. of Educ.* (Brozer I), No. 90-3087, 1990 WL 165606, at *6 (N.D. Ill. Oct. 22, 1990) (holding, in the context of the IDEA's predecessor statute, the Education for the Handicapped Children Act ("EHCA"), that allowing "a party [to] raise new issues[] . . . would effectively defeat Congress' intent that the local and state educational agencies, not the courts, have the primary responsibility for formulating an appropriate educational program for a handicapped child through the extensive procedures mandated by the EHCA"); *Max M. v. Thompson*, 585 F. Supp. 317, 326 (N.D. Ill. 1984); *Leonard ex rel. Leonard v. McKenzie*, 869 F.2d 1558, 1563 n.4 (D.C. Cir. 1989) (stating that "we do not think it at all unjust to foreclose appellants from advancing arguments before the courts which they could have raised before the hearing officer"). This approach finds support in both common sense and requirements laid upon this Court by the standard of review: the court must give the HO's findings of fact "due weight," a task made impossible where the HO has made no factual findings. *Brozer I*, 1990 WL 165606, at

---

[6] Plaintiffs' Motion often fails to provide pincites or accurate cites altogether, leaving for the Court work Plaintiffs' attorney should have done himself.

*6; *Leonard*, 869 F.3d at 1563 (holding that it "would be both unfair and unwieldy to overturn the hearing officer's decision on grounds that she had no opportunity to consider or evaluate"). The Court addresses each argument as they pertain to the relevant prongs of the *Rowley* test.

## A. *Rowley*'s First Prong: Plaintiffs' Procedural Arguments

The Court deals initially with Plaintiffs' arguments under the first prong of *Rowley*. Plaintiffs first appear to argue that Defendant did not comply with the IDEA's procedures because it denied the Guardian the opportunity to participate in developing Paulie's IEP. (Pls.' Mem. in Supp. of Pls.' Mot. ("Pls.' Mem.") 8.) Second, although Plaintiffs cite a non-existent section of the IDEA, they argue that Defendant violated the IDEA by not providing written notice of a proposed change in Paulie's placement under 20 U.S.C. § 1415(b)(3). (Pls. Mem. 11 (erroneously citing 20 U.S.C. § 1415(b)(1)(C)).) Plaintiffs also contend that Defendant failed to evaluate the full nature and extent of Paulie's disabilities. (Pls.' Mem. 16-23.)

### 1. Guardian's Participation

While Plaintiffs initially argue that Defendant failed to allow the Guardian the opportunity to fully participate in the development of the IEP (*Id.* at 8), the remainder of this argument is devoted to contending that Paulie's placement at Easter Seals was inappropriate (*Id.* at 8-11). This Court addresses only the former argument, as the latter has no relevance to the present inquiry.[7]

---

[7] Plaintiffs essentially invite this Court to re-weigh evidence the HO held showed Paulie's placement at Easter Seals was appropriate. (Pls.' Mem. 8-11.) In accordance with the

(continued...)

The IDEA requires the school to create an IEP "team" comprised of various members of the school district, including teachers and the "parents of a child with a disability." 20 U.S.C. § 1414(d)(1)(B)(i) (2006). The school district also must provide "an opportunity for the parents of a child with a disability . . . to participate in [IEP] meetings." 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.501(b)(i) (requiring "[t]he parents of a child with a disability . . . be afforded an opportunity to participate in meetings with respect to," inter alia, the development of the child's IEP).

This Court cannot find a single instance in which the Guardian was denied the opportunity to participate in any IEP meeting, and Plaintiffs do not point to any. Instead, Plaintiffs spend an excessive amount of time arguing that Paulie's placement at Easter Seals was inappropriate. This Court agrees with the HO's finding that "the [G]uardian was more than adequately . . . involved in the formation of a free, appropriate public education for her grandson." (R. at 14.) Indeed, "[the Guardian] attended all the IEP meetings and actively participated in . . . [Paulie's] education." (*Id.*) Therefore, this Court finds that Defendant complied with § 1415(b)(1).

###    2.    Notification Under 20 U.S.C. § 1415(b)(3)

In addition to the opportunity for parental participation school districts must provide, the IDEA requires the school to notify parents in writing before it "proposes to initiate or change[,]

---

[7](...continued)
standard of review, the Court declines this invitation. Paulie is no longer at Easter Seals, and, in any case, this Court agrees with the HO that Paulie remained at Easter Seals after January 2006 because the Guardian thwarted Defendant's efforts to place Paulie in a different school by refusing to explore options Defendant proposed. (R. at 15.)

or . . . refuses to initiate or change, the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child." 20 U.S.C. § 1415(b)(3)(A)-(B). Plaintiffs argue Defendant committed another procedural violation when it failed "to make a clear, coherent offer of placement to . . . Plaintiffs[] . . . [as] *Union [Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994),] and *Knable [ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 768 (6h Cir. 2001), require]."[8] (Pls.' Mem. 15.) Defendant responds that Plaintiffs have waived this argument, and, even if they have not, Defendant provided adequate notice under the IDEA. (Def.'s Resp. to Pls.' Mot. 8-9.) In the event that this Court finds Plaintiffs did not waive this argument, Defendant urges this Court to "[defer] to the [HO's] finding on this issue" because "Plaintiffs[] [have] not put forth any new evidence." (*Id.* at 9.)

This Court finds that Plaintiffs waived this argument by not raising it before the HO. Assuming, however, Plaintiffs did not waive this argument, the Court now decides this issue. But before proceeding, the Court notes it cannot accommodate Defendant's request to defer entirely to the HO. That would ignore the standard of review, which requires this Court to give "due weight" to the HO's factual findings only. Courts review HO's decisions regarding questions of law de novo. Whether § 1415(b)(3) is a provision with which a school district must strictly comply is a matter of law; therefore, this Court reviews that question de novo.

---

[8] Plaintiffs also argue that the HO erred by "not limiting the assessment of the proposed IEP to the terms of the document presented initially to the [Mother]." (Pls.' Mem. 15.) The Court first observes that its findings in this section—that Plaintiffs waived the § 1415(b)(3) argument and that Defendant's substantial compliance with the IDEA did not prejudice Plaintiffs—make the resolution of this issue unnecessary here. Regardless, the Court addresses and rejects this argument below. *See infra* section (II)(B)(1).

Courts hold different views on whether a school must strictly comply with § 1415(b)(3) to discharge its duty under the IDEA. *Compare Smith*, 15 F.3d at 1526 (holding that strict compliance with § 1415(b)(3) required), *and see Max M. v. Ill. State Bd. of Educ.*, 629 F. Supp. 1504, 1518 (N.D. Ill. 1986) (holding that procedural notice violations did not result in denial of FAPE where adequate parental involvement existed because the parental involvement satisfied the purpose of the (IDEA's predecessor) statute's procedural protections), *with Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 625 (6th Cir. 1990) (holding that strict compliance with § 1415(b)(3) not required when no prejudice results); *but see Knable*, 238 F.3d at 768 (not explicitly overturning *Thomas* but citing *Smith* for support that the written offer requirement should be enforced vigorously). In *Smith*, the court adopted a strict approach to compliance, holding that any violation of § 1415(b)(3), even a merely technical one, contravened the IDEA. The court reasoned that the written-offer requirement severed several important purposes. 15 F.3d at 1526. First, it would create a clear record that can obviate "troublesome factual disputes many years later about" the timing and type of placement the school district offered. *Id.* Second, the court stated the requirement also would assist parents in presenting complaints. *Id.* Third, in *Smith*, the written offer could have "alerted the [parents] to the need to consider seriously whether" the proposed placement was appropriate, which also would have allowed the parents to decide whether to oppose the offer. *Id.* Finally, a written offer would have required the school district to be more prepared to introduce "sufficient relevant evidence" to the hearing officer. *Id.*

In *Thomas*, by contrast, the court held that the school district's "technical non-compliance" with § 1415(b)(3) did not violate the IDEA. 918 F.2d at 625. In so holding, the court "conclud[ed] that plaintiff's cause was not prejudiced" by this technical non-compliance. *Id.* It

noted that "[the parent] received numerous telephone calls alerting her to the controversy arising from the panel's concern over [the child's] ability to withstand school-based education." *Id.* Furthermore, the parent took additional time to review records in preparation for the IEP conference, which the court stated did not "[take] her by surprise." *Id.* Finally, the court held that, "although she may not have received written notice that a new IEP conference would be held, [the purpose of the notice requirement was satisfied when] she . . . participate[d] in the conference." *Id.*

Although the benefits of a written offer are apparent, this Court finds the *Thomas* court's approach adequately addresses Congress' concern in crafting the IDEA's procedural safeguards. Where the school district makes an offer, though not written, and the parent does not suffer prejudice as a result, the IDEA's procedural protections serve their purpose. Rigorous *ex post* enforcement of such procedures where the parent has not been prejudiced merely exposes cooperative schools to a technical nail upon which they may become caught. In other words, such an approach would transform the IDEA from the shield of disabled children into the sword of emotional parents, penalizing districts that have satisfied the IDEA's purpose. Thus, because this kind of technical non-compliance does not violate the purpose of the IDEA's procedural safeguards, strict compliance with § 1415(b)(3) is unnecessary. As a result, this Court holds that a school district's failure to provide the parent(s) with a formal written offer under § 1415(b)(3) does not violate the IDEA when no prejudice results to the parent(s).

This holding, however, does not settle the matter. The Court still must determine whether Defendant's actions prejudiced the Guardian. The HO found that the Guardian knew of the offer and otherwise had sufficient notice based on the numerous communications between the

-27-

Guardian and Defendant. (R. at 14.) Additionally, the HO noted that the Guardian could not have suffered prejudice because, like the parent in *Thomas*, the Guardian attended the IEP meeting at which the proposed placement was offered. (*Id.*) Since Plaintiffs provided no new evidence on this issue, and the HO's decision thoroughly explored the matter, the Court finds no occasion to revisit it here.[9] Therefore, this Court finds that a school district's substantial compliance with § 1415(b)(3), which resulted in no prejudice to the Guardian, discharged its duty under the IDEA.

### 3. Evaluation of Plaintiff's Disabilities

Plaintiffs' final procedural argument deals with 20 U.S.C. § 1414(a)(1)(A), which requires "[a] State educational agency, other State agency, or local educational agency [to] conduct a full and individual initial evaluation." Specifically, Plaintiffs argue that Defendant violated 34 C.F.R. § 300.15 (2008), which states: "*Evaluation* means procedures used in accordance with §§ 300.304 through 300.311 to determine whether a child has a disability and the nature and extent of the special education and related services that the child needs." (emphasis in original). Plaintiffs, however, fail to claim violations of any specific sections contained in 34 C.F.R. §§ 300.304 through 300.311. Instead, they claim that Defendant failed to "reevaluate Paulie's Asperger['s Syndrome] for any adverse educational effects on his learning and failed to determine the special education and related services he needed in response to those adverse educational effects." (Pls.' Mem. 17.) Plaintiffs also claim that Defendant "misevaluated"

---

[9] In any event, the Court reviewed the IEP notes and evidence and finds that the HO's decision is correct. The Court concludes that the versions of the documents are substantially the same. Therefore, the objections the Guardian voiced in response to initial copy she received (academics and large class size) apply equally to the finalized version. In other words, she did not suffer prejudice.

Paulie's reading and writing deficits. (*Id.* at 20.) The cases Plaintiffs cite for support–*Bd. of Educ. of Oak Park and River Forest H.S. Dist. No. 200 v. Kelly E.*, 21 F. Supp. 2d 862, 875 (N.D. Ill. 1998) *vacated and remanded on other grounds*, 207 F.3d 931 (7th Cir. 2000), and *Warren G. v. Cumberland County Sch. Dist.*, 190 F.3d 80, 87-88 (3d Cir. 1999)–recite general propositions that a district must fully evaluate and understand the child's disabilities.[10] (Pls.' Mem. 17.)

On this issue, the HO found that Paulie had been evaluated numerous times with the Guardian's consent. (R. at 14.) Based on the evidence presented, the HO found that "[t]here is no medical or other evidence to suggest that student's disabilities are anything other than what . . . [Defendant] currently recognizes." (*Id.*) Plaintiffs point primarily to the report of Dr. Porumbescu, who observed Paulie, to support their argument that Defendant failed to evaluate Paulie's disabilities. But in that report, Dr. Porumbescu stated only that "the [IEP] team *may* want to reconsider the previous diagnosis from a private evaluation of Asperger's Syndrome." (Pls.' Mem., Ex. 4 at 19 (emphasis added).) The report suggested a possible course of action, which Defendant was not required to pursue. Given Plaintiffs acknowledged that Defendant performed and paid for extensive testing for Paulie over the years (Pls.' Mem. 19), their argument that Defendant refused to conduct further necessary testing is weak. It did not convince the HO in October 2007 (R. at 14), and it does not persuade this Court today.

---

[10] *Warren G.* cites an older version of the C.F.R. when making these statements. 190 F. 3d. at 87 (citing 34 C.F.R. § 300.532(b) (1991) and 34 C.F.R. § 300.532(f) (1991)). Even if this Court graciously used the analogous provisions of the current C.F.R. to frame Plaintiffs' legal arguments for them, these arguments would fail. *See* 34 C.F.R. § 300.304(c)(2) (2008) (containing identical language to 34 C.F.R. § 300.532(b) (1991)), *and* 34 C.F.R. § 303.304(c)(4) (2008) (containing identical language to 34 C.F.R. § 300.532(f) (1991)). For the reasons stated in this section, Defendant sufficiently assessed and evaluated Paulie.

The Court reaches the same conclusion as to Plaintiffs' complaints regarding Paulie's reading and writing deficits. After Dr. Ferre's evaluation, Defendant conducted several more evaluations of Paulie from which it determined Paulie's placement was appropriate. (Pls.' Mem. 20.) The fact that Plaintiffs disagree with the results of these evaluations, or the measures Defendant implemented in response to them, does not, by itself, mean Defendant violated any provision of the IDEA or the Code of Federal Regulations. Additionally, the HO noted, and this Court finds it indicative of the Guardian's behavior, that the Guardian had previously refused "[Defendant's] recommend[ation] [that it conduct] a social developmental study to determine if . . . [Paulie] was at the same level as his age peers when they considered returning him to the [D]istrict." (R. at 14.)

Here, the Court looks primarily to the IEP team's recommendations and the numerous tests Defendant performed on Paulie over the years. Although the reports of Dr. Ferre and Dr. Porumbescu are relevant, they are not conclusive. Whatever weight they have here, it cannot overcome Defendant's extensive testing and consideration of all Paulie's disabilities. For all of these reasons, the Court finds Defendant did not violate 20 U.S.C. 1414(a)(1)(A) or 34 C.F.R. § 300.15.

## B. *Rowley*'s Second Prong: Plaintiffs' Substantive Arguments

Under *Rowley*'s second prong, Plaintiffs argue that the IEP did not provide Paulie with a FAPE. (Pls.' Mem. 23-31.) In making this argument, Plaintiffs contend that Defendant failed to implement an IEP that was reasonably calculated to provide Paulie with educational benefits. (*Id.* at 23-26.) Plaintiffs also argue Defendant erroneously disregarded the Guardian's hostility. (*Id.* at

27.) Additionally, Plaintiffs contend that Meadowview is not the LRE for Plaintiffs. (*Id.* at 26.)

### 1. Paulie's IEP

Plaintiffs' substantive arguments address whether Paulie received a FAPE. (*Id.* at 23-31.)

Primarily, Plaintiffs contend that Paulie's IEP was not reasonably calculated to provide a FAPE.

(*Id.* at 23.) Before assessing that claim, however, the Court must evaluate another issue Plaintiffs

raise. They claim that, because the Mother obtained the June 14, 2007, IEP before Defendant

edited the document, the version handed to her should govern. (*Id.* at 23-24.)

The Court disagrees that it may consult only the version of the IEP handed to the Mother.

The key issue is whether the IEP, which includes the implemented IEP, was reasonably

calculated to provide Paulie with an FAPE.[11] *O'Toole v. Olathe Dist. Schs. Unified Sch. Dist.*

*No. 233*, 144 F.3d 692, 702 (10th Cir. 1998) (stating that "an IEP is a program, consisting of both

---

[11] The decision Plaintiffs cite, and the numerous other decisions cited therein, do not prevent the Court from considering the implemented IEP. (Pls.' Mem. 15 (citing *Knable*, 238 F.3d at 768 (citing *Burilovich v. Bd. of Educ. of the Lincoln Consol. Schs.*, 208 F.3d 560, 568 (6th Cir. 2000) (holding that the IEP consists of a written document); *Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss*, 144 F.3d 391, 398 (6th Cir. 1998) (holding the IEP improper when used as a "first draft–a starting point–that would have been further developed and refined"); *Briere v. Fair Haven Grade Sch. Dist.*, 948 F. Supp. 1242, 1256 (D.Vt. 1996) (stating that the focus is on the IEP itself, not "whether an IEP might have been developed after [the child's] placement"))).) Those cases held that an incomplete IEP cannot be rendered sufficient because of a school district's *mere capacity* to fulfill the IEP requirement at a later date; the IEP requirement must be satisfied as written. Here, Defendant never argued that it *could have* provided a sufficient IEP–it argues that it did so, and that the first version was essentially an unrevised document that needed to be edited. The differences between the two versions were minor and at least one difference between them was the result of a typographical error. The Court does not conclude, and the HO did not find, merely that "[Defendant] had the *capacity* to offer [the child] an appropriate program." *Knable*, 238 F.3d at 768 (emphasis added).

the written IEP document, and the subsequent implementation of that document"). Unused versions of the IEP have no bearing whatsoever on whether the *IEP used by the school district* provided a FAPE. Although Defendant gave the Mother a copy of the IEP, it was not the final version of the document. Furthermore, the evidence establishes that Defendant informed the Mother of the correct class size at the June 14, 2007, IEP meeting. Defendant has established, and the HO found, that it was common practice to edit the IEP after the meeting to "clean it up" and incorporate the Guardian's comments. Defendant did exactly that after the June 14, 2007, meeting, correcting a typographical error. Finally, the HO found, as does this Court after reviewing the two documents, that the two documents were substantially similar.[12]

It is simply untrue, as Plaintiffs suggest, that the Mother did not participate in developing the final version of the IEP (Pls.' Mem. 23-24), which was merely an edited version of the copy given to her. Because Defendant has implemented the revised version of the IEP, and not the copy it provided to the Mother, the copy provided to the Mother does not entirely control whether Paulie received a FAPE. Therefore, the Court uses the both versions to assess Plaintiffs' claims.

"Whether a school district has provided a [FAPE] . . . is a mixed question of law and fact." *Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Ill. State Bd. of Educ.*, 41 F.3d 1162, 1166 (7th Cir. 1994). As previously noted, under the IDEA, a school district must provide qualifying disabled students with a FAPE in the LRE. 20 U.S.C. §§ 1412(a)(1), (5). An appropriate education is not necessarily commensurate with the "best" education. *Heather S.*, 125 F.3d at 1057. To meet this standard a student's IEP must be "'reasonably calculated to enable the

_____

[12] Plaintiffs point out that a program aide was not included in the IEP version handed to the Mother. The Court finds that this omission did not violate the IDEA.

-32-

child to receive educational benefits.'" *Alex R.*, 375 F.3d at 615 (quoting *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 248 (5th Cir. 1997)). "[I]n other words, [the IEP is sufficient] when it is 'likely to produce progress, not regression or trivial educational advancement.'" *Id.* (quoting *Michael F.*, 118 F.3d at 248). The amount of educational advancement required for each child will vary. *Id.* The Seventh Circuit has suggested that the necessary amount of progress needed to satisfy this standard will correlate, at least to some degree, with "the student's abilities," which reflect the severity of the child's disability. *Id.* Measuring a child's progression may seem difficult, but "[o]bjective factors, such as regular advancement from grade to grade, and achievement of passing grades, usually show satisfactory progress." *Id.*

Based on the IEP and objective factors, the Court finds Paulie's IEP was reasonably calculated to provide Paulie with educational benefits. The IEP addressed Paulie's behavioral and learning disabilities. The IEP provided Paulie with instruction in cross-categorical settings for academic subjects. In these classes, he would have more attention from teachers and fewer pupils with which to compete for assistance. This environment would have allowed Paulie to make academic progress while accounting for his sensitivities and tendency to become distracted. In keeping with the IDEA's directive, Paulie's IEP also required mainstreaming for non-academic classes.

Additionally, and most importantly, Paulie's academic progress is real. At Timber Ridge, he has earned two "As," three "Bs," and one "C." Even if Paulie could do "better" with a different or alternative kinds of instruction, that does not affect whether the current IEP is appropriate. *Alex R.*, 375 F.3d at 616 (stating that "[t]he dispositive question . . . is not whether the District

-33-

provided [the child] with the best conceivable IEPs; the question is whether the IEPs that it actually provided for him were 'reasonably calculated to enable the child to receive educational benefits'"); *see Heather S.*, 125 F.3d at 1057 (stating that "[t]he issue is whether the [current] placement was appropriate, not whether another placement would also be appropriate, or even better for that matter," deferring to the school district's placement, and noting that "there likely is more than one solution to the problem of best educating [the child]"). The Court is unconvinced by Plaintiffs' argument that the IEP, because it allowed for large classroom size, did not adequately address Paulie's Asberger's Syndrome and ADHD. (Pls.' Mem. 25.) As noted, the IEP varied the classes that Paulie attended based on the subject. Paulie's classes for academic subjects were smaller than his other classes, such as physical education and recess. The fact that Paulie had Asberger's Syndrome did not automatically disqualify all large classroom settings. In any case, that is not a decision for this Court to make: "[a] court is particularly incapable of making such judgments, which is why it must defer to trained educators . . . ." *Heather S.*, 125 F.3d at 1057. A long black robe and a gavel give the judge authority to rule on legal issues, not to make educational policy judgments–and a court should not "substitute "'[its] own notions of sound educational policy for those of the school authorities [that] they review.'"" *Id.* (quoting *Bd. of Educ. of Cmty. Consol. Sch. Dist. No. 21 v. Ill. Bd. of Educ.* (Brozer II), 938 F.2d at 715 (quoting *Rowley*, 458 U.S. at 206)).

The reports of Dr. Porumbescu and Ms. Taylor do not affect the Court's calculus. Dr. Porumbescu's observation that Paulie was teased and made fun of in "in the public school setting" is tempered by the fact that Paulie also was teased at Acacia. Morever, both Dr. Porumbescu and Ms. Taylor's "on- and off-task" observations explain little about whether

Paulie's IEP was reasonably calculated to provide him with educational benefits. Dr. Porumbescu evaluated Paulie's behavior only once at Acacia compared to four times at Timber Ridge. At Acacia, Dr. Porumbescu did not compare Paulie's behavior to another student in his class, all of whom were disabled. Additionally, the amount of time Paulie spent off-task is not remarkable and, in some cases, comes close to, or was less than, the other observed student's off-task time. The same can be said for Ms. Taylor's lone observation, which tells the Court little about whether Paulie's IEP was reasonably calculated to provide him with educational benefits.[13]

This Court further notes that, like in *Heather S.*, here "a great number of teachers and other professionals closely involved with [Paulie's] education over a number of years [helped] . . . [assess] [his] needs." 125 F.3d at 1057. As to Paulie's placement, the IEP team, with the exception of the Guardian and her representatives, agreed on the appropriate school setting. This Court therefore finds, as did the HO, that Paulie's IEP is reasonably calculated to provide educational benefits.[14]

### 2. Parental Hostility and the Least Restrictive Environment

Plaintiffs also argue that Paulie's IEP is insufficient because it did not consider parental hostility. (Pls. Mem. 27-29.) Because Plaintiffs failed to raise this argument before the HO, they have waived it. But assuming they did not, their claim still fails.

---

[13] In any case, the Court, in making its decision, relied little, if any, on this additional evidence.

[14] Because "the issue is whether the [current] placement is appropriate, not whether another placement would also be appropriate," this Court need not examine whether Acacia also is an appropriate educational placement. *Heather S.*, 125 F.3d at 1057.

A court can consider whether the school district, in response to parental hostility, placed a child in a school simply to "'discipline' [the] parents." *Brozer II*, 938 F.2d at 717-718. Using that standard, and in spite of the fact that the Court has no decision to which we can give "due weight," the Court finds that Defendant's placement was not meant to discipline the Guardian or the Mother. *Id.* Even though the Guardian opposed placement at Timber Ridge, Defendant adequately considered this hostility in deciding that Paulie should attend that school, not Acacia.

Finally, Plaintiffs argue that Defendant did not place Paulie in the LRE. To provide a FAPE, the IDEA requires schools to educate disabled students in the "least restrictive environment." 20 U.S.C. § 1412(a)(5). Schools must, "to the maximum extent appropriate," *id.*, "mainstream" disabled students by placing them in classes with non-disabled students. *Alex R.*, 375 F.3d at 618. Plaintiffs argue that Paulie's placement is not the LRE because it does not include any "non[-]disabled students in [his] cross-categorical instruction classes." (Pls.' Mem. 27.) While the IDEA favors mainstreaming, *Beth B. v. Van Clay*, 282 F.3d 493, 498 (7th Cir. 2002), it does not require that all cross-categorical instruction occur with non-disabled students. 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114 (2008). Instead, it requires that the disabled child be mainstreamed "[t]o the maximum extent appropriate." *Id.* This limiting language has the following effect: even if further mainstreaming is possible, the IDEA does not require it unless the mainstreaming is appropriate. *Beth B.*, 282 F.3d at 498.

In *Beth B.*, the school district removed the disabled child from the regular classroom setting. *Id.* The parents objected, claiming that the school could not remove their child if she received "any" benefit. *Id.* The Seventh Circuit rejected this argument, stating that such a standard would contravene IDEA's purpose: "[i]nstead of granting flexibility to educators and

-36-

school officials, it places an extreme restriction on their policymaking authority and the deference they are owed." *Id.* at 498-99. In other words, it destroyed the school district's ability to place disabled children in "separate special education environments." *Id.* at 499.

Plaintiffs argue that Timber Ridge is not the LRE because Paulie is mainstreamed only for non-academic courses. (Pls.' Mem. 27.) At first blush, this seems to suggest that Timber Ridge has *less* mainstreaming opportunities for Paulie than Acacia. But that cannot be correct because Acacia is almost entirely comprised of disabled students. Certainly Paulie's six-week stay at Acacia, where he attended all of his classes exclusively with disabled students, was *more* restrictive than his current placement, which includes interaction with non-disabled students.

But Plaintiffs are not through. They argue that "[e]ven if [Timber Ridge] . . . allow[ed] more mainstreaming opportunities than Acacia, it has the opposite effect." (Pls.' Mem. 27.) Given that Paulie had no interaction with non-disabled students during his time at Acacia, it is not clear how Paulie's placement at Timber Ridge could have "increased [his] rejection by [his non-disabled peers] and [his] social isolation." (*Id.* at 27.) Paulie's current placement gives him the social opportunities that he lacked at Acacia.

In the end, the Court defers to Defendant's expertise. Paulie is performing well academically, earning mostly "As" and "Bs." The IEP team has developed a plan that it feels caters to Paulie's disabilities and need for mainstreaming. While the Plaintiffs argue that the large classroom setting harms Paulie and prevents him from socializing and making friends, the evidence shows otherwise. By nearly all accounts, Paulie likes Timber Ridge. Socially, Paulie has faired well, interacting with other students and practicing social courtesies. His IEP team reports that he has been doing well, and he still does not require a one-on-one aide or a BIP.

The Court also has considered the additional evidence submitted by Plaintiffs that purports to show that Paulie dislikes Timber Ridge and has been abused there. Paulie did have two incidents at Timber Ridge. The first incident occurred on October 6, 2008. (Pls.' Mot. for Supplemental Evidence, Ex. 2.) Another student with "sensory tendencies" struck Paulie. (*Id.*) The second incident occurred in a bathroom on January 23, 2009. In the Bathroom, Paulie made monster noises with his pants down and chased at least one student. Defendant submitted evidence showing that Paulie's pants had fallen down while going to the bathroom, and that Paulie understood that he should probably use the stall in the future. Additionally, the evidence showed that only one or two students knew about the incident.

Plaintiffs characterize this incident as evidence that Paulie is not receiving a FAPE. Defendant portrays these occurrences as two isolated incidents. The Court finds that, while unfortunate, these incidents do not show Defendant has failed to provide a FAPE in the LRE. Furthermore, they fail to show that Paulie's IEP was not reasonably calculated to provide educational benefits. Incidents at school, whether they are physical encounters or emotional embarrassments, are an inevitable byproduct of peer interaction. Neither of these incidents, even when taken together, show Defendant failed to provide a FAPE in the LRE or that the implemented IEP was insufficient. Therefore, this Court finds that Defendant provided Paulie with a FAPE in the LRE. In so doing, Defendant developed an IEP that was reasonably calculated to provide educational benefits to Paulie.

In making this judgment, the law demands that the Court review Defendant's assignment to ensure it accords with the IDEA's mandate, not to second-guess policy decisions or to make ad hoc educational placement decisions from the bench. Plaintiffs have failed to convince this

-38-

Court, after its review of the administrative record and the supplemental evidence, that Paulie's placement is inappropriate.

## IV. Conclusion

After reviewing all of the evidence, including the administrative record, the parties' briefs and attached exhibits, as well as the new evidence the parties' submitted, this Court finds that Plaintiffs have not shown, by a preponderance of the evidence, that Defendant committed any procedural or substantive violations of the IDEA. To the contrary, Defendant has provided, and continues to provide, Paulie with a FAPE in the LRE. For all of the aforementioned reasons, this Court denies Plaintiffs' Motion for summary judgment and grants Defendant's Motion for summary judgment. Therefore, Plaintiffs' complaint is dismissed with prejudice.

**ENTER ORDER:**

**MARTIN C. ASHMAN**

Dated: April 9, 2009.                    United States Magistrate Judge